UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re:                                                            Chapter 11

22 Maple Street, LLC, et al.,                                     Case No. 18-40816-NHL
                                                                  Case No. 18-40817-NHL
                                                                  Case No. 18-40818-NHL
                                                                  Case No. 18-40819-NHL

                                    Debtors.                      Jointly Administered

-------------------------------------------------------------x

**MOTION TO APPROVE BIDDING PROCEDURES AND PROVIDING CERTAIN
PROTECTIONS TO STALKING HORSE; AND AUTHORIZING THE SALE OF
THE REAL ESTATE ASSETS OF THE SELLING DEBTORS FREE AND CLEAR OF
ALL LIENS, CLAIMS, INTERESTS AND NON-PERMITTED ENCUMBRANCES**

22 Maple Street, LLC ("Maple"), 25 Oriol Drive, LLC ("Oriol"), and 59 Coolidge Road, LLC ("Coolidge"), by their attorneys, Goldberg Weprin Finkel Goldstein LLP, hereby move (the "Motion") this Court for entry of orders (i) approving bid procedures[1] and providing certain protections to a new duly organized entity to be formed, comprised of an investor group led by the Brach family as the head of the new investor group, which may include Apex Rehabilitation & Healthcare, Next Step Healthcare, and perhaps Larry Lipschutz, depending on the outcome of final internal negotiations (the "Stalking Horse"); and (ii) authorizing the sale of substantially all of the real estate assets (collectively, the "Properties") of Maple, Oriol and Coolidge (collectively, the "Selling Debtors"), free and clear of all liens, claims, taxes and non-permitted encumbrances. The proposed sale does not include the assets of 20 Kinmonth Road LLC relating to the Waban Facility, which will be administered and sold separately.

In support of this Motion, the Selling Debtors respectfully represent as follows:

---

[1] Terms defined in the Bidding Procedures or Asset Purchase Agreement shall have the same meaning in this Motion.

## Preliminary Statement

The Motion seeks entry of two orders:

(a)    entry of an order (the "Bid Procedures Order," substantially in the form attached hereto as Exhibit A) approving the proposed bid procedures (the "Bid Procedures," a copy of which are attached as Exhibit 1 to the Bid Procedures Order), and providing a break-up fee of $460,000 (the "Break-Up Fee") to the Stalking Horse in connection with its base price cash offer of $23 Million ($23,000,000) Dollars (the "Stalking Horse Bid"); and

(b)    entry of an order approving the sale (the "Sale Order"), authorizing the sale of substantially all of the Properties free and clear of claims, liens, taxes and non-permitted encumbrances pursuant to the proposed Bid Procedures (as described herein, the "Sale"),

The Selling Debtors and their secured creditor, Capital Funding LLC ("Capital"), believe that that the selection of the Stalking Horse, and the proposed Bid Procedures, including but not limited to the Break-Up Fee, are all designed to provide order to the process and thereby maximize the return to the Debtors' creditors and other parties in interest. An auction sale of the Properties is the most efficient way to protect the interests of all concerned.

In connection with the auction, the Selling Debtors will be filing a motion to approve the retention of Blueprint Healthcare Real Estate Advisors as broker to market the Properties.

The Selling Debtors and Capital are moving to gain Bankruptcy Court approval of the attached bidding procedures with the intent of also obtaining approval of corresponding bidding procedures in connection with the Receivership proceedings.  Notwithstanding the foregoing, and as set forth in the Stalking Horse Contract, the Bankruptcy Court shall not be asked to exercise jurisdiction over the Facility Sale.

## Jurisdiction and Venue

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## The Chapter 11 Cases

4.      The Selling Debtors each filed separate voluntary petitions under Chapter 11 of the Bankruptcy Code on February 14, 2018, and each has continued in possession of its property as a debtor-in-possession pursuant to section 1107 and 1108 of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The cases are being jointly administered pursuant to Order dated April 22, 2018.

5.      The Selling Debtors are each real estate holding companies, which own the following real Properties at which nursing home facilities are operated by non-debtor affiliates:

| Name of Debtor | Address of Real Property | Operating Facility |
|---|---|---|
| 22 Maple Street, LLC | 22 Maple Street, Amesbury, MA | Merrimack Valley Health Center |
| 25 Oriol Drive, LLC | 25 Oriol Drive Worcester, MA | Worcester Health Center |
| 59 Coolidge Road, LLC | 59 Coolidge Road Watertown, MA | Watertown Health Center |

6.      The Properties are encumbered by a total first mortgage lien and security interest securing four term loans in the original aggregate balance of $36,856,627, made on or about March 4, 2014, with Capital as the Agent for the four syndicated lenders. The loans are all cross

3

collateralized by the Properties, and each of the Debtors is jointly and severally liable on the loans. As of the Petition Date, the principal balance owed to Capital had been reduced to approximately $31,110,090.97.

7.    Prior to bankruptcy, Capital filed its *Verified Complaint and Request for Appointment of Receiver* and related *Emergency Motion to Appoint a Receiver* against the selling Debtors and others in the Superior Court of Massachusetts.

8.    The Massachusetts State Court entered an order ("Receivership Order"), appointing KCP Advisory Group, LLC, as the receiver for the nursing homes and other assets (the "Receiver"). By this Motion, the Selling Debtors seek an order approving bidding procedures and a sale of the Properties as set forth herein.

## The Selection of the Stalking Horse Bidder

9.    The Selling Debtors and the Stalking Horse have negotiated, subject to the Court's approval, an Asset Purchase Agreement ("APA"), a copy of which is attached hereto as Exhibit "B". The APA provides in relevant part:

- Sale of the Properties, free and clear of all claims, liens, taxes and non-permitted encumbrances.
- The purchase price (the "Purchase Price") for the Properties shall consist of:
  - (i)    Payment of $23 million in cash at closing;
  - (ii)   Payment of outstanding real estate taxes owed by the Selling Debtors to local taxing districts accruing through closing;
  - (iii)  Reimbursement to the Stalking Horse of all Operating Contributions representing funds advanced by the Brach family to cover operating expense deficiencies anticipated to be approximately $1,000,000;
  - (iv)   Payment of all administrative fees and expenses in the Selling Debtors' bankruptcy cases; and
  - (v)    Payment of any other allowed claims against the Selling Debtors.
- Payment by the Stalking Horse of a $2,300,000 earnest money deposit.
- In the event a higher and better bid is obtained at the auction, reimbursement of all Operating Contributions and payment of the Break-Up Fee of $460,000.

10.     The APA will serve as the opening bid for the Properties at an auction to be held on August 31, 2018 (the "Auction").

<b>Extraordinary Provisions</b>

11.     Administrative Order No. 557 of the United States Bankruptcy Court for the Eastern District of New York requires that certain Extraordinary Provisions be disclosed and are set forth as follows:

(i)     <u>Sale to Insider</u>: The Stalking Horse will be owned in whole or in part by the Brach family (the "Brach Group"), likely in combination with Apex, Next Step and perhaps Larry Lipschutz. The Brach Group has an ownership interest in the Borrowers. Larry Lipschutz has an ownership interest in the Debtors, and is also a guarantor of the Debtors' indebtedness to Capital.

(ii)    <u>Interim Arrangements with the Stalking Horse</u>: The Stalking Horse has agreed that it shall advance funds up to the sum of approximately $1,000,000 to cover various operating expense deficiencies (the "Operating Contribution").

(iii)   <u>Transfer Tax Exemption</u>: The selling Debtors are seeking to have the Sale declared exempt from taxation under section 1146(a) of the Bankruptcy Code, and will seek confirmation of a plan in conjunction with the Auction process, and a closing to occur after confirmation.

(iv)    <u>Coordination</u>: It is anticipated that the Auction will be coordinated in connection with a sale of the Operating Facilities by the Receiver. The Facility Sale shall be subject to the jurisdiction of the State Court, and the Bankruptcy Court shall <u>not</u> be requested to exercise jurisdiction over the Facilities.

<b>The Proposed Bid Procedures</b>

12.     This section summarizes key provisions of the procedures for the Auction. Capitalized terms used, but not defined in this section, shall have the meanings provided in the Bid Procedures. The descriptions of the Bid Procedures herein are qualified in their entirety by reference to the Bid Procedures attached to the Bid Procedures Order as <u>Exhibit 1</u>.

<u>Participation Requirements</u>. Any person desiring to submit a competing bid for all or part of the Assets (a "Potential Bidder") will be required to deliver the following (the "Participation Requirements") to the Selling Debtors and Capital on or before _____, 2018: (1) an executed

confidentiality agreement in form and substance satisfactory to the Selling Debtors and to Capital; and (2) written evidence of available funds or a firm commitment for financing sufficient for the Potential Bidder to consummate the Sale satisfactory to the Selling Debtors and to Capital. The financial information and credit-quality support of any Potential Bidder must demonstrate the financial capability of the Potential Bidder to timely consummate the Sale pursuant to a Qualified Bid (as defined below).

Interested investors requesting information about the qualification process, and Qualified Bidders (as defined below) requesting information in connection with their due diligence, should contact the Broker retained by the Selling Debtors.

Due Diligence. The Selling Debtors will afford any Potential Bidder who satisfies the Participation Requirements such due diligence access or additional information as the Selling Debtors, in its business judgment, determines to be reasonable and appropriate; provided, however, that the same access and information must also be made available to the Stalking Horse. Additional due diligence will not be provided after the Bid Deadline.

Bid Deadline. The deadline for any bids shall be_____, 2018 at 4:00 p.m. (prevailing Eastern Time). Such bids must be received on or before that date by (1) counsel for the Selling Debtors, Kevin J. Nash, Goldberg Weprin Finkel Goldstein LLP, 1501 Broadway, 22nd Floor, New York, NY 10036 (KNash@gwfglaw.com); (2) counsel for Capital, Paige Barr Tinkham, Esq., Katten Muchin Rosenman, 525 W Monroe St, Chicago, IL 60661-3629 (paige.tinkham@kattenlaw.com); and (3) counsel for the Receiver, John T. Morrier, Casner & Edwards, LLP, 303 Congress Street, Boston, MA 02210 (morrier@casneredwards.com), (collectively, the "Notice Parties").

Designation of Stalking Horse Bidder. The Selling Debtors and Capital have selected the Stalking Horse Bid, on the terms and conditions set forth in the APA, as the current highest and best bid and to serve as the opening bid for the Auction. The next highest bid must exceed the Stalking Horse Bid by at least the Break-Up Fee of $460,000 plus reimbursement of the Operating Contribution, and $250,000 (the "Initial Overbid"). The bidding will continue in increments of at least $250,000 in cash or cash equivalents.

Bid Requirements. To be eligible to participate in the Auction, each bid and each Potential Bidder submitting such a bid must, in the Selling Debtors' discretion, subject to the approval of Capital:

6

(1)   offer to consummate the Sale on the same conditions and other terms no less favorable to the Selling Debtors than those set forth in the APA;

(2)   include a marked copy of the APA to show any proposed amendments thereto (the "Modified Agreement") and a clean and executed Modified Agreement;

(3)   include a statement of any conditions precedent to the bidder's ability to enter into a definitive agreement consistent with the APA and that all necessary internal and shareholder approvals have been obtained prior to the bid;

(4)   state that such offer is binding and irrevocable until the consummation of the Property Sale;

(5)   offer to pay a purchase price that is equal to or greater than the Initial Overbid;

(6)   disclose the identity of each entity that will be bidding or otherwise participating in connection with such bid, and the complete terms of any such participation;

(7)   include the names and contact information of members of the bidder who will be available to answer questions regarding the offer, including advisors and related parties;

(8)   include a good-faith deposit in immediately available funds in the amount of ten percent (10%) of the purchase price;

(9)   provide written evidence of available funds or a timeline for obtaining a commitment for financing sufficient to consummate the Property Sale satisfactory to the Selling Debtors with the approval of Capital Funding LLC; and

(10) provide information on the operational and financial capabilities of the proposed bidder sufficient to allow the Selling Debtors and Capital Funding LLC to determine such bidder's ability to consummate the transaction.

Qualified Bidders and Bids. Potential Bidders who have satisfied the Participation Requirements will be deemed "Qualified Bidders." Bids that contain all bid requirements, as determined by the Selling Debtors and Capital, will be deemed "Qualified Bids." The Selling Debtors and Capital reserve the right to waive noncompliance with any bid requirement.

The Selling Debtors will advise each Potential Bidder whether they are deemed to be a Qualified Bidder and whether their bid is a Qualified Bid before the Auction. The Stalking Horse is deemed a Qualified Bidder and the Stalking Horse Bid is a Qualified Bid in all respects. The Selling Debtors will provide copies of the Qualified Bids to Capital and to the Receiver.

Auction Participation. Unless otherwise agreed to by the Selling Debtors, only Qualified Bidders, Capital, and their legal or financial professionals are eligible to attend or participate at the Auction. Subject to the other provisions of the Bid Procedures, if the Selling Debtors do not receive any Qualified Bids other than the Stalking Horse Bid or if no Qualified Bidder other than the Stalking Horse has indicated its intent to participate in the Auction, the Selling Debtors will not hold an Auction and the Stalking Horse will be named the Successful Bidder.

Auction. If any Qualified Bid other than the Stalking Horse Bid for the Assets has been received and any Qualified Bidder other than the Stalking Horse has indicated its intent to participate in the Auction, the Selling Debtors will conduct the Auction at 10:00 am (prevailing Eastern Time) on August 31, 2018 at the offices of Goldberg Weprin Finkel Goldstein LLP, 1501 Broadway, 22nd Floor, New York, NY 10036. At the Auction, only the Stalking Horse and other Qualified Bidders will be permitted to increase their bids or make any subsequent bids. The Selling Debtors, with the approval of Capital, may conduct the Auction in the manner they reasonably determine, in their business judgment, will promote the goals of the bid process, will achieve the maximum value for all parties in interest and is not inconsistent with any of the provisions of the Bid Procedures, the Bankruptcy Code or any order of the Bankruptcy Court entered in connection herewith. Such rules will provide that:
(1) the procedures must be fair and open, with no participating Qualified Bidder disadvantaged in any material way as compared to any other Qualified Bidder; and
(2) all bids will be made and received in one room, on an open basis, and all other Qualified Bidders will be entitled to be present for all bidding with the understanding that the true identity of each Qualified Bidder and all of its principals will be fully disclosed to all other Qualified Bidders and that all material terms of each Qualified Bid will be fully disclosed to all other bidders throughout the entire Auction; and
(3) each Qualified Bidder will be permitted a fair, but limited, amount of time to respond to the previous bid at the Auction.

Closing the Auction. The Auction shall continue until there is only one offer that the Selling Debtors and Capital determine, subject to Bankruptcy Court approval, is the highest and best offer from among the Qualified Bidders (including the Stalking Horse) submitted at Auction (the "Successful Bid"). The Qualified Bidder submitting such Successful Bid shall become the "Successful Bidder", and shall have such rights and responsibilities of a purchaser, as set forth in the APA (or Modified Agreement, as applicable).

Immediately prior to the conclusion of the Auction, the Selling Debtors and Capital shall (1) review each bid made at the Auction on the basis of financial and contractual terms and such other factors as may be relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale; (2) identify the Successful Bid; and (3) notify all Qualified Bidders at the Auction, prior to its conclusion, of the name or names of the Successful Bidder and the amount and other material terms of the Successful Bid.

The Selling Debtors and Capital shall also select a back-up bid (the "Back-Up Bid"), which shall remain open and irrevocable until one (1) business day after the closing of the sale with the Successful Bidder. In the event that, for any reason, the Successful Bidder fails to close the transaction contemplated by the Successful Bidder, the Selling Debtors and Capital may elect to regard the Back-Up Bid as the highest or best bid for the Assets, and the Selling Debtors will be authorized to consummate the transaction contemplated by the Back-Up Bid without further hearing or order of the Bankruptcy Court.

13.    To induce the Stalking Horse to expend the time, energy and resources necessary to maintain the status quo, the Selling Debtors seek the Court's approval of the negotiated Break-Up Fee with Capital, which consists of the reimbursement of the Operating Contribution plus the payment of $460,000, or 2% of the cash portion of the Stalking Horse Bid (2% x $23million).

## The Basis for the Requested Relief

14.    The proposed Bid Procedures are reasonable and necessary to effectuate the sale process, test the market, and provide sufficient notice and opportunity to permit other bidders to participate in the Auction.

15.    Under Bankruptcy Rule 6004(f)(1), the Selling Debtors may sell property outside the ordinary course of business by private sale or by public auction. In this case, the Selling Debtors believes that an auction will expose the Properties to a broad and diverse market and ensure a sale for the highest and best offer.

**1.    The Proposed Bid Procedures Are Reasonable and Necessary**

16.    The Bid Procedures were developed after much discussion between the Selling Debtors and Capital, and meet the Selling Debtors' objective of conducting the Auction in a structured, fair and open fashion.

17.    Once the Selling Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" In re S.N.A. Nut Co., 186 B.R. 98 (Bankr. N.D. Ill. 1995); In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992); Comm. of Asbestos-Related Litigants v. Johns- Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[A] presumption of reasonableness attaches to a Debtor's management decisions.").

18.    Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets from the estate. See, e.g., Integrated Res., 147 B.R. at 656–57 (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (same).

19.    The paramount goal in any proposed auction of property of the estate is to maximize the proceeds received by the estate. See, e.g., In re Food Barn Stores, Inc., 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); Integrated Res., 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the . . . [debtors'] duty with respect to such sales is

10

to obtain the highest price or greatest overall benefit possible for the estate.") (quoting In re Atlanta Packaging Prods., Inc., 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

20. To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. See, e.g., Integrated Res., 147 B.R. at 659 (such procedures "encourage bidding and to maximize the value of the debtor's assets"); In re Fin. News Network, Inc., 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991), ("[C]ourt-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates.").

21. The Selling Debtors have sound business justifications for seeking approval of the Bid Procedures at this juncture, which promote the interests of creditors, residents and employees. Indeed, the Selling Debtors are cognizant of the financial exigencies and the need to proceed with the Chapter 11 cases as efficiently as possible.

22. Moreover, the Selling Debtors believe that the Bid Procedures will establish the market parameters under which the Sale with the Stalking Horse will be tested, even though the Stalking Horse is an insider group. The Bid Procedures have been designed with Capital to encourage competitive bidding in an orderly manner.

### 2. The Break-Up Fee is in the Best Interests of the Selling Debtors' Estates

23. To induce the Stalking Horse to expend the time, energy and resources necessary to submit the Stalking Horse Bid, the Selling Debtors and Capital have agreed to provide, and hereby seek approval of a Break-up Fee in the amount of $460,000, or two percent of the cash portion of the Stalking Horse Bid, as set forth in the Bid Procedures.

24.    Given the operating requirements and the multi-jurisdictional aspects of the sale, the Selling Debtors and Capital believe that the Break-Up Fee is fair and reasonable in view of (a) the intensive work undertaken by the Stalking Horse in connection with the transaction, (b) the willingness of the Stalking Horse to fund deficiencies while the sale process is proceeding, and (c) the fact that if the Break-Up Fee is triggered the Selling Debtors will have closed on a higher or otherwise better offer for the Properties, to the benefit of Capital.

25.    Bidding incentives in favor of a stalking horse are measured against a business judgment standard. In re Integrated Res., Inc., 147 B.R. 650, 657 (S.D.N.Y. 1992).

26.    To receive administrative expense priority pursuant to section 503(b) of the Bankruptcy Code, the bidding incentive must provide some post-petition benefit to the estate. See In re O'Brien Envtl. Energy, Inc., 181 F.3d 527, 533 (3d Cir. 1999).

27.    Here, the benefits provided by the Stalking Horse are self-evident, since the Brach Group is prepared to fund operating shortfalls while proceeding in good faith under a widely marketed auction.

28.    The Selling Debtors submit that the Break-Up Fee is a normal, and often necessary component of sales outside the ordinary course of business under section 363 of the Bankruptcy Code. See, e.g., In re Kupp Acquisition Corp., Case No. 96-1223 (PJW) (Bankr. D. Del. March 3, 1997); In re Kmart, Case No. 02-B-02474 (SPS) (Bankr. N.D. Ill. May 10, 2002) (authorizing a termination fee and overbid amounts for potential bidders); In re Comdisco, Inc., Case No. 01- 24795 (RB) (Bankr. N.D. Ill. Aug. 9, 2002) (approving a termination fee as, *inter alia*, an actual and necessary cost and expense of preserving the debtor's estate, of substantial benefit to the debtor's estate, and a necessary inducement for, and a condition to, the proposed purchaser's entry into the purchase agreement); In re Crowthers McCall Pattern, Inc., 114 B.R.

877 (Bankr. S.D.N.Y. 1990) (approving an overbid requirement in an amount equal to the approved break-up fee).

### The Sale Order Should Be Approved

#### 1.    The Proposed Sale is an Exercise of Sound Business Judgment and Should Be Approved

29.    The Selling Debtors submit that ample authority exists for the approval of the Sale. Section 363 of the Bankruptcy Code, in conjunction with applicable provisions of Section 1123, authorizing a debtor to sell assets of the estate other than in the ordinary course of business under a plan or otherwise.

30.    Although Section 363 does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets, courts have held that approval of a proposed sale of property pursuant to section 363(b) is appropriate if the transaction represents the reasonable business judgment of the debtor. See Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063 (2d Cir. 1983); see also In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991) (holding that a court must be satisfied that there is a "sound business reason" justifying the pre-confirmation sale of assets); In re Phoenix Steel Corp., 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith").

31.    If a valid business justification exists for the sale, as it does in this case, the debtor's decision to sell property out of the ordinary course of business enjoys a strong presumption "that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in an honest belief that the action taken was in the best interests

of the company." In re Integrated Res., Inc., 147 B.R. at 656. Therefore, parties objecting to the Selling Debtors' proposed Sale must make a showing of "bad faith, self-interest or gross negligence." Id. at 656; see also In re Johns-Manville Corp., 60 B.R. at 616 ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from decisions made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

32.     Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was given to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. See, e.g., In re Delaware & Hudson Ry. Co., 124 B.R. at 176; In re Phoenix Steel Corp., 82 B.R. at 335–36. The proposed Sale satisfies all these factors.

33.     First, the Selling Debtors have proposed the Sale after thorough consideration of all viable alternatives and extensive negotiations with Capital.  A sale promotes a better understanding of the current fair market value of the Properties in today's environment.  The maximization of asset value reflects a sound business purpose that warrants authorization of the proposed Sale.

34.     Second, the Selling Debtors' primary creditor, Capital, was involved in developing the Bid Procedures and Bid Procedures Order.  The other creditors of the Selling Debtors are not materially impacted since their claims are being paid in full regardless.

35.     Third, the Sale was negotiated in good faith and at arm's length among the Selling Debtors, the Brach Group and Capital.

## 2. The Proposed Sale Should Be Free and Clear of all Claims, liens, Taxes and Non-Permitted Encumbrances

36.    The Selling Debtors further submit that it is appropriate to sell the Properties free and clear of all liens, claims, taxes, and non-permitted Encumbrances, pursuant to section 363(f) of the Bankruptcy Code. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

(1)    applicable non-bankruptcy law permits sale of such property free and clear of such interests;

(2)    if such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

37.    Because section 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Selling Debtors' Properties "free and clear" of liens and interests. Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n. 24 (6th Cir. 1991) (stating that section 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of section 363(f) is met); In re Dundee Equity Corp., 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met.").

38.    The Court also may authorize the sale of a debtor's assets free and clear of any liens pursuant to section 105 of the Bankruptcy Code, even if section 363(f) did not apply. See In re Trans World Airlines. Inc., 2001 WL 1820325, at *3 (Bankr. D. Del. Mar. 27, 2001)

(stating that "bankruptcy courts have long had the authority to authorize the sale of estate assets free and clear even in the absence of § 363(f)"); see also Volvo White Truck Corp. v. Chambersberg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of liens] is within the court's equitable powers when necessary to carry out the provisions of Title 11.").

39.    The Selling Debtors believe that one or more of the tests of section 363(f) are satisfied with respect to the sale based upon the consent of Capital. Additionally, the Stalking Horse is assuming all real estate tax liabilities. Accordingly, section 363(f) authorizes the sale and transfer of the assets free and clear of any such liens.

### Notice

40.    Notice of this Motion has been provided by overnight delivery to (a) the Office of the United States Trustee for the Eastern District of New York; (b) all of the Debtors' creditors; (c) Capital; (d) the Receiver; (e) the Office of the Massachusetts Attorney General; and (f) all other parties who have requested notice in this case. The Selling Debtors submit that, in light of the nature of the relief requested, no other or further notice is necessary or required.

WHEREFORE, the Selling Debtors respectfully requests that the Court enter the order approving bid procedures and providing certain protections to the Stalking Horse; (ii) authorizing the (a) sale of substantially all of the Assets free and clear of all liens, claims and non-permitted encumbrances to the Stalking Horse or such other higher or better bidder, and (b) the assumption and assignment of the Facility Leases as modified; and (iii) granting such other and further relief as is just and proper.

Dated: New York, New York
        June 22, 2018

GOLDBERG WEPRIN FINKEL
GOLDSTEIN LLP
*Counsel for 90 West Street LLC*
1501 Broadway, 22 Floor
New York, NY 10036
(212) 221-5700


By:    /s/ Kevin J. Nash, Esq.