UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x

In re                                                                    Chapter 11

     22 Maple Street, LLC, et al.,                    Case no.  18-40816

                    Debtor.            Jointly Administered

---------------------------------------------------------x

## OBJECTION TO MOTION FOR AUTHORITY TO PROSECUTE

     Zisha Lipshutz ("Lipshutz"), as and for his objection to the motion ("Sale

Motion") made 22 Maple Street, LLC, et al. (the "Debtors") for the entry of an order approving

the sale of the Debtors' real property at 22 Maple Street, Amesbury, Massachusetts, 25 Oriol

Drive, Worcester Massachusetts and 59 Coolidge Road, Watertown, Massachusetts (collectively,

the "Properties") to A&L Holdings, LLC (the "Insider Purchaser,"), respectfully represents as

follows:

**(a) The Debtors' petitions were filed by persons without authority to act on the Debtors' behalf, and based on misleading statements as to Mr. Lipshutz' status,**

**(b) The Sale Motion should be denied due to defective notice, an artificially accelerated timeline, the absence of a broker until it was too late to be effective, and an overall lack of transparency,**

**(c) If the Court does not deny the Sale Motion outright, the insider manipulation should at least disqualify the Insider Purchaser from a good faith finding since the timeline and the bid procedures (including the unnecessary breakup fee) chilled any potential bidders, and**

**(d) Lipshutz does not deny that the Properties must be sold, but the sale process must be transparent and competitive; so as an alternative to denying the Sale Motion, Lipshutz suggests that the Debtors give their broker a fresh 60 day marketing period to solicit bids, and conduct an auction shortly thereafter with no breakup fee.**

## BACKGROUND

1.      On February 14, 2018 each of the Debtors filed a Chapter 11 petition. But they filed with no authority.

2.      The resolution authorizing the petitions is signed by Zigmund Brach as Manager and Larry Lipshutz. The resolutions state that "Avi Lipshutz will resign from the Companies once a change in the operating licenses for Waban Health Center LLC, Valley Health Center LLC, Watertown Health Center LLC and Worcester Health Center LLC have been approved by applicable state agencies." The list of equity holders has three names "Massachusetts Centers LLC," "Avi "Zisha Lipshtz (Resigned)" and Larry Lipshutz.

3.      Collectively annexed hereto as Exhibit A are the operating agreements for each of the Debtors.  The sole member of each Debtor is Synergy Health Centers, LLC.  The sole manager of each Debtor is Avi "Zisha" Lipshutz.

4.      Mr. Lipshutz knows of no amendments to the operating agreements. Mr. Lipshutz had not resigned as manager when the petitions were filed. Mr. Lipshutz did not cede control over the Debtors until June 2018 during a Bes Din arbitration.

5.      Mr. Lipshutz' prior consent to the Chapter 11 filings was neither sought nor given. Nor was Mr. Lipshutz' consent sought or given to the retention of Y C Rubin as Chief Restructuring Officer. Nor was Mr. Lipshutz' consent sought or given to the retention of Debtor's counsel.

6.      Each Debtor listed Mr. Lipshutz as a codebtor on schedule H because he was and remains a named guarantor of the Capital Finance LLC first mortgages on each of the

Debtor's Properties. Every unpaid dollar on the Capital Finance LLC notes and mortgages is a dollar of exposure to Mr. Lipshutz on his personal guarantee.

7.      Capital Finance LLC asserts a $31,000,000 claim. The proposed purchase price for the sale of the assets is $23,000,000. The value of the unsold Waban Health Center remains to be seen. Mr. Lipshutz's interest in the outcome totals millions of dollars of exposure on a deficiency claim.

8.      But each of the Debtors failed to list Mr. Lipshutz as a notice party. The first and only notice served on Mr. Lipshutz was a "Notice of Auction and Sale" in early to mid-July 2018. That notice was probably given solely to satisfy the Insider Purchaser's title company due diligence concerns, because Mr. Lipshutz was then removed from the service list. He was not served with the later bar date notice or any other document.

9.      Mr. Lipshutz was, however, included on the service list in the affiliated 90 West cases so until he received the sale notice in this case, he had no reason to suspect he was not being served in these cases.

10.     Capital Finance LLC did not serve Mr. Lipshutz with its March 22, 2018 motion to lift the automatic stay to foreclose on the Properties.

11.     On April 20, 2018, the Debtors objected (Exhibit B). Paragraph 3 of the objections states that the Debtors understood the need for sales "in relatively short order." The Debtors reveal further that that the insider Brach family already chose themselves as stalking horse asserting that "the Brach Family is well positioned to lead a new buy-out group to serve as a stalking horse buyer in each of the cases pursuant to a transparent and competitive bidding process."

12.     Although the lift stay objection states that since the bankruptcy filings the Debtors have been giving "due care" to "developing the best sale framework," "pursuant to a transparent and competitive bidding process," by the end of April 2018, the case had been in bankruptcy for three months, but no broker had been retained to locate at an arms-length stalking horse bidder. Instead, the Insider Purchaser chose themselves as the stalking horse at a purchase price NOT "pursuant to a transparent and competitive bidding process."

13.     Then they waited another two months until June 22, 2018 to move to sell. Still no broker had been retained to make the stalking horse bid selection process transparent and competitive. The Sale Motion is silent on the selection of insiders as the stalking horse. Since the Insider Purchasers did not have to contend with competing stalking horse offers, they wrote their own terms.

14.     The Insider Purchasers not only selected themselves as the stalking horse, they awarded themselves a breakup fee of (a) $1,000,000 for alleged operating deficiencies they purportedly subsidized, and an additional (b) $460,000 as compensation for the alleged work involved in naming themselves the stalking horse.

15.     If the Insider Purchasers actually have an administrative claim, it should be disclosed, itemized and paid under the same terms and priority as other administrative claims. Here, the operating reports disclose no disbursements in any of the cases. And at the initial case management conference when the Court asked about the affiliated nursing home expenses, The Insider Purchasers repeatedly said they would make capital contributions Hearing Transcript, 3/22/18 pp. 37-43. The Insider Purchasers mislead the Court. The breakup fee is a disguised super-priority debtor in possession financing facility for the same panoply of operating expenses with senior secured claims status granted on almost no notice.

16.     On the $460,000 portion of the breakup fee, the Debtors Insider Purchasers did not need due diligence to decide whether to purchase since they were supposed to be the source of the due diligence for non-insider bidders. But the Insider Purchasers awarded themselves $460,000 for "the intensive work undertaken by the Stalking Horse in connection with the transaction," and for "the willingness of the Stalking Horse to fund deficiencies while the sale process is proceeding."

17.     Although the Insider Purchasers stated at the beginning of the case that they would make capital contributions to fund the case, under the guise of bidding procedures, they are now entitled to super-priority debtor in possession financing with senior secured claims status for $1,000,000 of such advances, *and* an additional $460,000 bonus payment for agreeing making the advances. Either they get the $1,450,000 or they get the Properties at their chosen purchase price.

18.     In paragraph 34, The Debtors rationalize this extraordinary departure from the norms for transparency and competitive bidding in bankruptcy sales by arguing that Capital Finance consents, and the other creditors "are not materially impacted since their claims are being paid in full regardless."

19.     Absent from the analysis is the impact of the sale on co-debtor Lipshutz who is exposed to a multimillion dollar deficiency claim.

20.     Having convinced Capital Finance to go along with the insider deal, the insiders then orchestrated a sale process with a time trap designed to chill competitive bids.

21.     They waited until June 22 to make the Sale Motion.. They moved to shorten time, obtained a hearing a few days later on June 28, and an order on July 6. They served

Lipshutz with nothing until after the July 6, 2018 order was entered. The bid deadline was August 28, 2018 during the traditionally slowest months for real estate sales. The Insider Purchasers obviously did not want competing bids. They hired no broker to solicit competing bids.

22.    On August 2, 2018, the Insider Purchasers finally made a motion for a broker. The broker order was approved and the broker started work on August 14, 2018 to solicit bids by August 28, which are among the slowest weeks in one of the slowest months for sales.

23.    In summary, filing the petitions under false pretenses, failing to give Lipshutz notice and opportunity to be heard on any matter, failing to hire a broker before selecting a stalking horse bid, creating an artificial emergency for approval of sale procedures, awarding themselves a $1,450,000 break-up fee, and continuing to avoid professional marketing until two weeks before the deadline to bid during one of the slowest sales periods of the year, indicates that the Insider Purchasers are trying to take the Properties at a steep discount, leaving Lipshutz liable for the resulting losses. The Court should not let them get away with it.

**(a) The Debtors' petitions were filed by persons without authority to act on the Debtors' behalf, and based on misleading statements as to Mr. Lipshutz' status,**

24.    A bankruptcy court lacks jurisdiction over a bankruptcy case unless the individuals asserting the right to act on behalf of the debtor had authority under state law and the entity's governance instruments. *Price v. Gurney*, 324 U.S. 100, 104, 65 S.Ct. 513, 89 L.Ed. 776 (1945). *See, In re East End Development, LLC* 491 B.R. 633, 639-40 (Bankr. E.D.N.Y. 2013), *In re NNN 123 N. Wacker, LLC*, 510 B.R. 854, 858 (Bankr. N.D. Ill. 2014), *In re G.T.L. Corp.*, 211 B.R. 241, 245 (Bankr. N.D. Ohio 1997).

25. Here, each of the Operating Agreements empower Mr. Lipshutz to operate the Debtors "until his successor shall have been duly appointed or until his earlier resignation or removal." As admitted in the filing resolutions, Mr. Lipshutz had not resigned as of the filing of the case and he therefore had sole authority to decide whether to authorize voluntary petitions at that time.

26. Since the resolution authorizing the Chapter 11 filing was executed by Zigmund Brach and Larry Lipshutz, it is a nullity. They lacked authority to act on the Debtors' behalf.

27. This Court's jurisdiction was invoked by false statements. To avoid detection, the insiders removed Mr. Lipshutz from the service list. This attempt to cover-up their dishonesty, only makes the initial misconduct worse.

28. Whether or not the Court determines that it has jurisdiction to continue hearing this case, the petitions were filed under false pretenses, a pattern that taints the sale process as well.

**(b) The Sale Motion should be denied due to defective notice, an artificially accelerated timeline, the absence of a broker until it was too late to be effective, and an overall lack of transparency**

29. A sale of assets outside the ordinary course of business is authorized by section 363(b)(1) of the Bankruptcy Code, which "requires notice and a hearing, and these procedural safeguards would be meaningless absent a further requirement that reasons be given for whatever determination is made." *In re Lionel Corp.*, 722 F.2d 1063, 1069 (2d Cir. 1983).

30. Here, the Debtors did not serve Lipshutz with the Sale Motion, nor was Lipshutz served with anything else, except the notice of sale, six months after the case was filed.

The absence of procedural safeguards for the party with the most to lose requires denial of the Motion.

31.    Even if the Debtors gave proper notice, "a judge determining a § 363(b) application [must] expressly find from the evidence presented before him [or her] at the hearing a good business reason to grant such an application." Id. at 1071.

32.    The bankruptcy judge "must not blindly follow the hue and cry of the most vocal special interest groups; rather, he [or she] should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike." *In re Lionel*, 722 F.2d at 1071. Thus, "a debtor applying under § 363(b) carries the burden of demonstrating that a use, sale or lease out of the ordinary course of business will aid the debtor's reorganization." *Id*. Where no extraordinary circumstances exist, a motion to approve a proposed sale outside the motion should denied.  *Id.* at 1070 (2d Cir. 1983), *accord, In re Ancor Exploration Company* 30 B.R. 802, 808 (N.D. Okla. 1983) (bankruptcy court must make factual determination supported by the record that emergency or similar compelling reason exists to approve private sale of substantially all of debtor's assets outside of a plan); *see also, In re Solar Mfg. Corp.* 176 F.2d 493, 494-95 (3d. Cir. 1949) ("If this corporation had a warehouse full of meat in storage and was without money to buy ice it is quite clear that emergency treatment would have to be applied to safeguard the assets.  But we do not think that in the ordinary case the elaborate protective provisions of Chapter X are to be short circuited by a trustee's sale on court order without going through the usual statutory procedure.")

33.    As a general matter, § 363 sales held on an expedited basis are disfavored. Courts are "extremely concerned by this time-trap," which is "inconsistent with the Code, due

process of law, the exercise of the court's authority and simple common sense." *In re Bombay Company, Inc.*, No. 07-44084-frn-11, 2007 WL 2826071, at *3 (Bankr. N.D. Tex. Sept. 26, 2007). Thus, "[a]t a minimum, if section 363(b)(1) is the means for effecting a debtor's disposition, the creditors should have the luxury of enough time for their representatives to assess fully the proposed transaction." *Id*, at *4; see also *In re Braniff Airways, Inc*., 700 F.2d 935, 940 (5th Cir. 1983) ("The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan sub rosa in connection with a sale of assets."); *In re Humboldt Creamery, LLC*, No. 09-11078, 2009 WL 2820610, at *2 (Bankr. N.D. Cal. Aug. 14, 2009) (stating that in such expedited § 363 sales, "the judge is reduced to a figurehead without any meaningful discretion and might as well leave his or her signature stamp with the debtor's counsel and go on vacation or shift attention to consumer cases where the law may still mean something"); *In re Gulf Coast Oil Corp*., 404 B.R. 407, 420-21 (Bankr. S.D. Tex. 2009) (discussing § 363 sales, and stating that "[t]he lack of transparency, the pace of the process, and the inconsistent treatment by the courts . . . leave the bankruptcy courts and parties in interest vulnerable to unfair dealing, abuse, and sweetheart deals") (internal citations omitted).

34.     Here, the Sale Motion should be denied because it did not even allege the existence of an emergency. Any emergency that existed was artificially created by the Insider Purchasers.

35.     That the sale is subject to competing bids is not sufficient, in itself, to ensure that the sale price is fair given the timing of the sale, the limited marketing by a broker, and the unreasonable bid protections. *See In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 149 (3d Cir. 1986) (rejecting assertion that "the 'auction' conducted for [the debtor's] assets

necessarily establishes that [the purchaser] paid 'value' " and stating that if the debtor and

purchaser "colluded with respect to the timing of [the debtor's] petitions for bankruptcy and its

motion to approve the [bid procedures order] in an attempt to chill the bidding for the assets

involved, it would follow that no 'auction' took place in the bankruptcy court; thus, the 'bidding'

could not, by definition, serve as the final arbiter of the 'value' of [the debtor's] assets").

36.      Based on Lipshutz' analysis of the Debtor's finances and similar sales, he

believes the value of the Properties exceeds $27,000,00. It is unreasonable to expect that

Properties with a value of at least $23,000,000 based on the Insider Purchaser bid to be

successfully marketed by a broker in only two weeks, in the last two weeks of August. During

this limited time, bidders cannot reasonably be expected to discover the existence of the deal,

conduct due diligence, obtain financing commitments and prepare for an auction based on

procedures heavily stacked against any meaningful competition.

37.      In summary the absence of proper notice, the accelerated timeline, the

absence of a broker until it was too late to be effective, the lack of transparency and absence of

competitive bidding require the Court to deny the Sale Motion.

**(c)  If the Court does not deny the Sale Motion outright, the insider manipulation
should at least disqualify the Insider Purchaser from a good faith finding since
the timeline and the bid procedures (including the unnecessary breakup fee)
chilled any potential bidders, and**

38.      Even if the Court approves the sale, the Insider Purchaser is not entitled to

a good faith finding.

39.      "[W]hen a bankruptcy court authorizes a sale of assets pursuant to section

363(b)(1), it is required to make a finding with respect to the 'good faith' of the purchaser." *In re*

*Abbotts Dairies of Pa., Inc*., 788 F.2d at 149-50. "The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Abbotts Dairies of Pa., Inc*., 788 F.2d at 147 (*quoting In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

40.    Applications made on an expedited basis are evidence of a debtor's lack of good faith in proposing the sale of its assets. *See In re Abbotts Dairies of Pa., Inc.*, 788 F.2d at 148 (stating that, in the event a debtor permitted a creditor to manipulate the timing of a bankruptcy filing "so that the bankruptcy court had no choice but to approve the [sale agreement], the terms of which were designed to preclude any truly competitive bidding for the assets," then it would, "as a matter of law, constitute 'collusion between the purchaser and . . . trustee . . ., or an attempt to take grossly unfair advantage of other bidders,' sufficient to destroy [the debtor's] 'good faith status' " (*quoting In re Rock Indus, Mach. Corp.*, 572 F.2d at 1198)); *see also In re Humboldt Creamery, LLC*, 2009 WL 2820610, *In re Adamson Co*., 29 B.R. at 941

41.    Bankruptcy courts have also found that a §363 sale whose effect was primarily to benefit insiders or secured creditors of the debtor or others whose motives were suspect were not proposed in good faith and could not be approved. *See e.g., In re Cloverleaf Enters., 2010 WL 1445487 at *3-4*; *In re Gulf Coast Oil Co.*, 404 B.R. at 426.

42.    While the Insider Purchasers may again argue that comparable sale procedures in similar or shorter duration have been approved in this and other jurisdictions, it is unlikely that in any such case: (i) insiders were named as the stalking horse with no stalking horse bid process, and then awarded an astonishing 6% breakup fee, despite the fact that the

insiders wearing different hats were obligated to prepare the due diligence materials for

competing bidders, (ii) insiders manufactured an emergency dsepite being aware that a sale was

necessary since before filing the case; (iii) insiders failed to serve the party most at risk by

approval of the sale, and (iv) insiders further chilled bidding by waiting to retain a broker until

the last minute, during two of the slowest sales weeks of the year.

43.    The breakup fee is especially notable. The rule is that "when reasonable in

relation to the bidder's efforts and to the magnitude of the transaction, breakup fees are generally

permissible. But if such a fee is too large, it may chill the bidding. . . In such instances, the fee is

not protected by the business judgment rule." *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28

(Bankr. S.D.N.Y. 1989). "[T]he allowability of breakup fees, like other administrative expenses,

depends upon the requesting party's ability to show that the fees were actually necessary to

preserve the value of the estate." *In re O'Brien Envtl. Energy, Inc., 181 F.3d 527, 535 (3d Cir.

1999)*. "[T]hat inquiry stems directly from § 503(b)(1)(A), which requires that an expense

provide some benefit to the debtor's estate." Id. at 536.

44.    "Although the assurance of a break-up fee may serve to induce an initial

bid (a permissible purpose), it may also serve to advantage a favored purchaser over other

bidders by increasing the cost of the acquisition to the other bidders (an impermissible purpose)."

*Id..; See also In re Reliant Energy Channelview LP*, 594 F.3d 200, 207 (3d Cir. 2010) ("[W]hile

we understand that the first bidder may be motivated in part to submit its bid by the possibility

that it will receive a break-up fee, it does not follow from that motivation that the bidder will

withdraw its bid, pass up on the opportunity to acquire the asset to be sold, and nullify its work

in preparing its bid if a court, when ordering that there be an auction of assets, declines to

authorize a break-up fee to be paid to the initial bidder.")

45.     Here, the breakup fee provided no enhanced benefit to the bankruptcy estate. It was unnecessary to lure the Insider Purchaser into becoming a stalking horse bidder whose bid would serve "as a catalyst to higher bids." The Insider Purchasers chose *not* to retain a broker to solicit stalking horse bids before awarding themselves the stalking horse privilege. The insiders affirmatively precluded any chance there would be competing stalking horse bids. Thus, there is no evidence that the breakup fee served any purpose except to either chill the bidding or award the insiders with an unjustified super-priority debtor in possession financing facility with senior secured claims status for $1,000,000 for advances that were supposed to be capital contributions, *and* an additional $460,000 bonus payment for making the advances..

46.     Again, the sale should be denied outright, and if not denied, the Purchaser should be denied a good faith finding.

**(d) Lipshutz does not deny that the Properties must be sold, but the sale process must be transparent and competitive; so as an alternative to denying the Sale Motion, Lipshutz suggests that the Debtors give their broker a new 60 day period to solicit bids, and conduct an auction shortly thereafter with no breakup fee.**

47.     Lipshutz supports the Debtors' stated intention to achieve the best result for the Debtors' estates by implementing a transparent and competitive bidding process. Lipshutz believes that the initial Court-ordered two-month marketing was reasonable and that the Court-retained broker is the right firm for the job.

48.     The sale process was nonetheless flawed because (a) the broker was retained too late to be effective, and (b) the breakup fee likely chills the bidding, and unfairly erodes the net purchase proceeds solely to benefit insiders. Fortunately, these problems are easily solved.

49.     As an alternative to dismissing the case, denying the Sale Motion or denying the Insider Purchasers a good faith finding, Lipshutz suggests that the marketing period be reopened for a new 60 day period, and the bid procedures amended to delete the breakup fee.

50.     In summary, Lipshutz believes the value of the Properties is at least $27,000,000, he believes with appropriate marketing, there are investors prepared to bid at a fair market price, and that both bankruptcy estate, Capital Funding and the guarantors of the Capital Funding obligations will benefit from a sale on an arms-length basis.

## CONCLUSION

WHEREFORE, Lipshutz respectfully requests that the Court deny the Sale Motion, or, alternatively, reform the sale procedures to reopen the marketing period for a new 60 day Period and to delete the breakup fee, and that the Court grant such other relief as may be just and proper.

Dated:      New York, New York
            September 9, 2018


                        **BACKENROTH FRANKEL & KRINSKY, LLP**
                        Attorneys for Lipshutz


                        By:     s/Mark A. Frankel
                                800 Third Avenue
                                New York, New York 10022
                                (212) 593-1100

Exhibit A

**OPERATING AGREEMENT**
**OF**
**22 MAPLE STREET, LLC**

This Operating Agreement of 22 Maple Street, LLC, (the "Company"), effective as of August 27, 2013 (this "Agreement"), is entered into by Synergy Health Centers, LLC (the "Member").

WHEREAS, the Company was formed on August 27, 2013 as an Delaware limited liability company, pursuant to the Delaware Limited Liability Company Act, as amended from time to time (the "Act"); and

WHEREAS, the Member desires to enter into this Agreement to define formally and express the terms of the Company and its rights and obligations with respect thereto.

NOW, THEREFORE, in consideration of the agreements and obligations set forth herein and for other good and valuable consideration, the Member hereby agrees as follows:

1.    <u>Formation</u>.    The Company has been formed and established as an Delaware limited liability company by the filing of a Certificate of Formation, pursuant to the Act (the "Certificate") with the Secretary of State of the state of Delaware.  The Member hereby ratifies, confirms and approves in all respects the actions taken in organizing the Company, including, without limitation, the preparation and filing with the Secretary of State of the state of Delaware of the Certificate and any additional filings, amendments and/or restatements thereof necessary with respect to qualification of the Company to do business.

2.    <u>Name</u>.    The name of the limited liability company pursuant to the Certificate is 22 Maple Street, LLC.

3.    <u>Purpose</u>.  The purpose of the Company is to provide nursing care services and any lawful act or activity, whether or not related thereto, for which limited liability companies may be organized under the laws of the state of Delaware, subject to the provisions of this Agreement.

4.    <u>Principal Office</u>.  The principal office of the Company shall be located at such place which the Manager may select from time to time.

5.    <u>Registered Agent</u>.  The name and address of the registered agent of the Company are set forth in the organizational documents of the Company.

6.    <u>Members and Capital Contribution</u>.  The name of the Member and the amount of cash or other property contributed or to be contributed by the Member to the capital of the Company are set forth on <u>Exhibit A</u> attached hereto and shall be listed on the books and records of the Company.  The Manager (as herein defined) of the Company shall be required to update the books and records, and the aforementioned Schedule, from time to time as necessary to accurately reflect the information therein.

7.      <u>Management of the Company</u>.  Avi "Zisha" Lipschutz shall serve as the manager of the Company (the "Manager"), until his successor shall have been duly appointed or until his earlier resignation or removal.  The business and affairs of the Company shall be managed by the Manager, and the Manager shall have the power to do any and all acts necessary or convenient to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by a manager of a limited liability company under the laws of the State of Delaware.

8.      <u>Allocation of Profits and Losses</u>.  The Company's profits and losses shall be allocated to the Member, in a manner that reflects his distributable shares of income of the Company.

9.      <u>Distributions</u>.  Distributions shall be made to the Member in accordance with his percentage interest in the Company.

10.     <u>Liability of Member, Manager</u>.  Neither the Member nor the Manager shall have any liability for the obligations or liabilities of the Company except to the extent provided herein or in the Act.

11.     <u>Indemnification</u>.  The Company shall indemnify and hold harmless the Manager and the Member and its partners, shareholders, officers, directors, managers, employees, agents and representatives and the partners, shareholders, officers, directors, managers, employees, agents and representatives of such persons to the fullest extent permitted by the Act.

12.     <u>Amendment</u>.  This Agreement may be amended from time to time with the consent of the Member.

13.     <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the state of Delaware.

******

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first set forth above.

**MANAGER:**

_____
Avi "Zisha" Lipschutz

**MEMBER:**

**SYNERGY HEALTH CENTERS, LLC**

_____
By:  Avi "Zisha" Lipschutz
Its:  Manager

# OPERATING AGREEMENT
## OF
# 20 KINMONTH ROAD, LLC

This Operating Agreement of 20 Kinmonth Road, LLC, (the "Company"), effective as of August 27, 2013 (this "Agreement"), is entered into by Synergy Health Centers, LLC (the "Member").

WHEREAS, the Company was formed on August 27, 2013 as an Delaware limited liability company, pursuant to the Delaware Limited Liability Company Act, as amended from time to time (the "Act"); and

WHEREAS, the Member desires to enter into this Agreement to define formally and express the terms of the Company and its rights and obligations with respect thereto.

NOW, THEREFORE, in consideration of the agreements and obligations set forth herein and for other good and valuable consideration, the Member hereby agrees as follows:

1. **Formation**. The Company has been formed and established as an Delaware limited liability company by the filing of a Certificate of Formation, pursuant to the Act (the "Certificate") with the Secretary of State of the state of Delaware. The Member hereby ratifies, confirms and approves in all respects the actions taken in organizing the Company, including, without limitation, the preparation and filing with the Secretary of State of the state of Delaware of the Certificate and any additional filings, amendments and/or restatements thereof necessary with respect to qualification of the Company to do business.

2. **Name**. The name of the limited liability company pursuant to the Certificate is 20 Kinmonth Road, LLC.

3. **Purpose**. The purpose of the Company is to provide nursing care services and any lawful act or activity, whether or not related thereto, for which limited liability companies may be organized under the laws of the state of Delaware, subject to the provisions of this Agreement.

4. **Principal Office**. The principal office of the Company shall be located at such place which the Manager may select from time to time.

5. **Registered Agent**. The name and address of the registered agent of the Company are set forth in the organizational documents of the Company.

6. **Members and Capital Contribution**. The name of the Member and the amount of cash or other property contributed or to be contributed by the Member to the capital of the Company are set forth on Exhibit A attached hereto and shall be listed on the books and records of the Company. The Manager (as herein defined) of the Company shall be required to update the books and records, and the aforementioned Schedule, from time to time as necessary to accurately reflect the information therein.

7.    <u>Management of the Company</u>.  Avi "Zisha" Lipschutz shall serve as the manager of the Company (the "Manager"), until his successor shall have been duly appointed or until his earlier resignation or removal.  The business and affairs of the Company shall be managed by the Manager, and the Manager shall have the power to do any and all acts necessary or convenient to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by a manager of a limited liability company under the laws of the State of Delaware.

8.    <u>Allocation of Profits and Losses</u>.  The Company's profits and losses shall be allocated to the Member, in a manner that reflects his distributable shares of income of the Company.

9.    <u>Distributions</u>.  Distributions shall be made to the Member in accordance with his percentage interest in the Company.

10.    <u>Liability of Member, Manager</u>.  Neither the Member nor the Manager shall have any liability for the obligations or liabilities of the Company except to the extent provided herein or in the Act.

11.    <u>Indemnification</u>.  The Company shall indemnify and hold harmless the Manager and the Member and its partners, shareholders, officers, directors, managers, employees, agents and representatives and the partners, shareholders, officers, directors, managers, employees, agents and representatives of such persons to the fullest extent permitted by the Act.

12.    <u>Amendment</u>.  This Agreement may be amended from time to time with the consent of the Member.

13.    <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the state of Delaware.

******

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

MANAGER:

_____
Avi "Zisha" Lipschutz

MEMBER:

SYNERGY HEALTH CENTERS, LLC

_____
By:  Avi "Zisha" Lipschutz
Its:  Manager

**OPERATING AGREEMENT**
**OF**

**59 COOLIDGE ROAD, LLC**

This Operating Agreement of 59 Coolidge Road, LLC, (the "Company"), effective as of August 27, 2013 (this "Agreement"), is entered into by Synergy Health Centers, LLC (the "Member").

WHEREAS, the Company was formed on August 27, 2013 as an Delaware limited liability company, pursuant to the Delaware Limited Liability Company Act, as amended from time to time (the "Act"); and

WHEREAS, the Member desires to enter into this Agreement to define formally and express the terms of the Company and its rights and obligations with respect thereto.

NOW, THEREFORE, in consideration of the agreements and obligations set forth herein and for other good and valuable consideration, the Member hereby agrees as follows:

1.      Formation.    The Company has been formed and established as an Delaware limited liability company by the filing of a Certificate of Formation, pursuant to the Act (the "Certificate") with the Secretary of State of the state of Delaware.  The Member hereby ratifies, confirms and approves in all respects the actions taken in organizing the Company, including, without limitation, the preparation and filing with the Secretary of State of the state of Delaware of the Certificate and any additional filings, amendments and/or restatements thereof necessary with respect to qualification of the Company to do business.

2.      Name.    The name of the limited liability company pursuant to the Certificate is 59 Coolidge Road, LLC.

3.      Purpose.  The purpose of the Company is to provide nursing care services and any lawful act or activity, whether or not related thereto, for which limited liability companies may be organized under the laws of the state of Delaware, subject to the provisions of this Agreement.

4.      Principal Office.  The principal office of the Company shall be located at such place which the Manager may select from time to time.

5.      Registered Agent.  The name and address of the registered agent of the Company are set forth in the organizational documents of the Company.

6.      Members and Capital Contribution.  The name of the Member and the amount of cash or other property contributed or to be contributed by the Member to the capital of the Company are set forth on Exhibit A attached hereto and shall be listed on the books and records of the Company.  The Manager (as herein defined) of the Company shall be required to update the books and records, and the aforementioned Schedule, from time to time as necessary to accurately reflect the information therein.

7.    <u>Management of the Company</u>.  Avi "Zisha" Lipschutz shall serve as the manager of the Company (the "Manager"), until his successor shall have been duly appointed or until his earlier resignation or removal.  The business and affairs of the Company shall be managed by the Manager, and the Manager shall have the power to do any and all acts necessary or convenient to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by a manager of a limited liability company under the laws of the State of Delaware.

8.    <u>Allocation of Profits and Losses</u>.  The Company's profits and losses shall be allocated to the Member, in a manner that reflects his distributable shares of income of the Company.

9.    <u>Distributions</u>.  Distributions shall be made to the Member in accordance with his percentage interest in the Company.

10.    <u>Liability of Member, Manager</u>.  Neither the Member nor the Manager shall have any liability for the obligations or liabilities of the Company except to the extent provided herein or in the Act.

11.    <u>Indemnification</u>.  The Company shall indemnify and hold harmless the Manager and the Member and its partners, shareholders, officers, directors, managers, employees, agents and representatives and the partners, shareholders, officers, directors, managers, employees, agents and representatives of such persons to the fullest extent permitted by the Act.

12.    <u>Amendment</u>.  This Agreement may be amended from time to time with the consent of the Member.

13.    <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the state of Delaware.

******

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first set forth above.

**MANAGER:**

_____
Avi "Zisha" Lipschutz

**MEMBER:**

**SYNERGY HEALTH CENTERS, LLC**

_____
By:  Avi "Zisha" Lipschutz
Its:  Manager

## EXHIBIT A

## MEMBERS AND INTEREST

| Member | Percentage |
|---|---|
| Synergy Health Centers, LLC | 100% |

## OPERATING AGREEMENT
## OF
## 25 ORIOL DRIVE, LLC

This Operating Agreement of 25 Oriol Drive, LLC, (the "Company"), effective as of August 27, 2013 (this "Agreement"), is entered into by Synergy Health Centers, LLC (the "Member").

WHEREAS, the Company was formed on August 27, 2013 as an Delaware limited liability company, pursuant to the Delaware Limited Liability Company Act, as amended from time to time (the "Act"); and

WHEREAS, the Member desires to enter into this Agreement to define formally and express the terms of the Company and its rights and obligations with respect thereto.

NOW, THEREFORE, in consideration of the agreements and obligations set forth herein and for other good and valuable consideration, the Member hereby agrees as follows:

1.    <u>Formation</u>.    The Company has been formed and established as an Delaware limited liability company by the filing of a Certificate of Formation, pursuant to the Act (the "Certificate") with the Secretary of State of the state of Delaware.  The Member hereby ratifies, confirms and approves in all respects the actions taken in organizing the Company, including, without limitation, the preparation and filing with the Secretary of State of the state of Delaware of the Certificate and any additional filings, amendments and/or restatements thereof necessary with respect to qualification of the Company to do business.

2.    <u>Name</u>.    The name of the limited liability company pursuant to the Certificate is 25 Oriol Drive, LLC.

3.    <u>Purpose</u>.  The purpose of the Company is to provide nursing care services and any lawful act or activity, whether or not related thereto, for which limited liability companies may be organized under the laws of the state of Delaware, subject to the provisions of this Agreement.

4.    <u>Principal Office</u>.  The principal office of the Company shall be located at such place which the Manager may select from time to time.

5.    <u>Registered Agent</u>.  The name and address of the registered agent of the Company are set forth in the organizational documents of the Company.

6.    <u>Members and Capital Contribution</u>.  The name of the Member and the amount of cash or other property contributed or to be contributed by the Member to the capital of the Company are set forth on <u>Exhibit A</u> attached hereto and shall be listed on the books and records of the Company.  The Manager (as herein defined) of the Company shall be required to update the books and records, and the aforementioned Schedule, from time to time as necessary to accurately reflect the information therein.

7.    <u>Management of the Company</u>.  Avi "Zisha" Lipschutz shall serve as the manager of the Company (the "Manager"), until his successor shall have been duly appointed or until his earlier resignation or removal.  The business and affairs of the Company shall be managed by the Manager, and the Manager shall have the power to do any and all acts necessary or convenient to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by a manager of a limited liability company under the laws of the State of Delaware.

8.    <u>Allocation of Profits and Losses</u>.  The Company's profits and losses shall be allocated to the Member, in a manner that reflects his distributable shares of income of the Company.

9.    <u>Distributions</u>.  Distributions shall be made to the Member in accordance with his percentage interest in the Company.

10.    <u>Liability of Member, Manager</u>.  Neither the Member nor the Manager shall have any liability for the obligations or liabilities of the Company except to the extent provided herein or in the Act.

11.    <u>Indemnification</u>.  The Company shall indemnify and hold harmless the Manager and the Member and its partners, shareholders, officers, directors, managers, employees, agents and representatives and the partners, shareholders, officers, directors, managers, employees, agents and representatives of such persons to the fullest extent permitted by the Act.

12.    <u>Amendment</u>.  This Agreement may be amended from time to time with the consent of the Member.

13.    <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the state of Delaware.

******

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first set forth above.

**MANAGER:**

_____
Avi "Zisha" Lipschutz

**MEMBER:**

**SYNERGY HEALTH CENTERS, LLC**

_____
By:  Avi "Zisha" Lipschutz
Its:  Manager

## EXHIBIT A

## MEMBERS AND INTEREST

| Member | Percentage |
| --- | --- |
| Synergy Health Centers, LLC | 100% |

Exhibit B

UNITED STATES BANKRUPTCY COURT       Return Date and Time:
EASTERN DISTRICT OF NEW YORK      April 26, 2018 at 3:30 p.m.
-----------------------------------------------------------x

In re:                            Chapter 11

22 Maple Street, LLC,            Case No. 18-40816-NHL

                    Debtor.
-----------------------------------------------------------x

In re:                            Chapter 11

25 Oriol Drive, LLC,             Case No. 18-40817-NHL

                    Debtor.
-----------------------------------------------------------x

In re:                            Chapter 11

59 Coolidge Road, LLC,           Case No. 18-40818-NHL

                    Debtor.
-----------------------------------------------------------x

In re:                            Chapter 11

20 Kinmonth Road, LLC,           Case No. 18-40819-NHL

                    Debtor.
-----------------------------------------------------------x

**DEBTORS' COMBINED JOINT OPPOSITION TO MOTION AND
AMENDED MOTION OF OXFORD FINANCE LLC AND CAPITAL
FUNDING LLC, EACH SEEKNG RELIEF FROM THE AUTOMATIC STAY**

**TO THE HONORABLE NANCY HERSHEY LORD,
CHIEF UNITED STATES BANKRUPTCY JUDGE:**

       The various debtors, 22 Maple Street, LLC ("Maple"), 25 Oriol Drive, LLC

("Oriol"), 59 Coolidge Road, LLC ("Coolidge"), and 20 Kinmonth Road, LLC ("Kinmonth")

(collectively, the "Village Debtors"), together with 90 West Street LLC ("90 West" or the

"Oxford Debtor") (jointly, the Village Debtors and 90 West are the "Debtors") as and for their

Joint Combined[1] Opposition to the amended motion (the "Motion") filed by Capital Funding

LLC (the "CF Lender") and Oxford Finance LLC (the "Oxford Lender") (jointly, the "Lenders"),

each seeking relief from the automatic stay, respectfully allege and show this Court as follows:

## PRELIMINARY STATEMENT

1.      Although the Chapter 11 cases are still in their relative early stages, the

Debtors have made progress towards developing a viable exit strategy and have circulated

detailed restructuring proposals each Lender.  As the negotiations continue, the parties may seek

to adjourn the hearings further, but if not, this Combined Opposition is designed to preserve all

of the Debtors' objections to the Motions, many of which raise factual disputes that warrant an

evidentiary hearing on issues of good faith, adequate protection, and the *Sonnax* factors.

2.      One thing is clear – namely that the issues involved are far more

complicated than a simple foreclosure process.  Due care must be given to developing the best

possible sale framework that protects multiple interests and constituents, while giving the

Lenders a fair opportunity to realize competitive market value.

3.      The Debtors did not file these cases to impede receiverships or obtain

delay for delay's sake. To the contrary, the Debtors have a defined goal to address the mortgage

debt through a sale and restructuring process in relatively short order.  In the interim, the Debtors

---

[1]  The Debtors are filing a Combined Opposition in each set of cases under separate captions
because the Motions raise similar facts, and virtually identical grounds for relief, and the basis
for the Opposition applies on parallel tracks.  Relevant distinctions will be made as to each
Lender, but the legal and factual issues are clearly inter-related and derive from a common
nucleus of operative facts, particularly since the Brach Family is leading the reorganization effort
in all of these cases.

will continue to cooperate with the Receiver[2] to pursue the <u>mutual</u> goal of maintaining stable nursing home operations so that a fair sale process can unfold in Chapter 11.

      4.    Perhaps, most germane to each Motion, the Debtors are now led by the Brach Family, which has the financial means to provide interim financing to cover potential operating shortfalls. <mark>Additionally, the Brach Family is well positioned to lead a new buy-out group to serve as a stalking horse buyer in each of the cases pursuant to a transparent and competitive bidding process.</mark> A state law foreclosure, lacking the apparatus of Sections 363(b) and (f), 365, and 1123(a)(5)(D) of the Bankruptcy Code, cannot achieve this type of result with the same degree of efficiency and clarity.  Indeed, it is the Debtors' belief that the Lenders now concur that Chapter 11 is the best vehicle in which to move a sale process forward.

      5.    Thus, the Court should resist the Lenders' knee-jerk response to seek stay relief, and take into account the highly complex set of facts and variables facing the Properties.

      6.    For example, although each of the Debtors technically constitutes a single asset real estate filing, the reality is that the Village Debtors[3] collectively own four major assets, all subject to the CF Lender's single mortgage without allocation.  Not all of the Village Debtors' properties and facilities, however, are in the same state of distress, although each entity is deemed a "co-borrower", jointly and severally liable for the entire indebtedness to the CF Lender.  Thus, these cases do not fit neatly within the parameters of single asset real estate filings, although the Debtors did check that box on their respective petitions.

---

[2] The same accounting firm, KCP Advisory Group LLC, is the Receiver in all five of the pending bankruptcy cases.  Mr. Paul Valentine is the Debtors' primary contact in the Receiver's office. The Receiver is developing budgets and projections regarding the Debtors' immediate cash requirements, which will be reviewed by the Debtors as part of the restructuring process, and communication lines are open.

[3] The term "Village Debtors" derives from the fact that all four properties were initially purchased from the prior "Village portfolio" – hence the name.

7.     Make no mistake; the Debtors are committed to achieving a successful result despite the challenges ahead.  The Debtors did not leap into bankruptcy cavalierly, and were mindful of the added complexities of seeking Chapter 11 relief on behalf of the nursing homes themselves.  To minimize these complexities, the Debtors have proceeded in measured terms, looking to develop a framework in bankruptcy for a sale process without causing undue interference in clinical operations, patient services or Receivership oversight.  Each of the Lenders should proceed with the same measured approach and caution.  Accordingly, the respective Motions should be denied without prejudice, or deferred for a reasonable period of time so the bankruptcy process can be given a reasonable chance at success.

### The Brach Family Involvement

8.     Since mid-January 2018, the Debtors have been led by the Brach Family (Zigmund Brach and his son-in-law, San Weisner). The Brach Family holds a preferred membership interest in each of the Debtors through their wholly owned companies known a Massachusetts Centers LLC and Woodbriar Center I LLC.  The Brach Family contributed approximately eighty (80%) of the funds to capitalize the Debtors and two other facilities. The Brachs' total investment is approximately $14 million, spread over seven facilities (five of which are in bankruptcy between the jointly administered Village Debtors and 90 West). The other members, Larry Lipschutz and his son Zisha Lipschutz, contributed the balance of the equity, although the Lipschutz family holds a higher percentage membership interest, subject to the Brach Family's senior rights and preferred return.

9.     For much of the Debtors' history, the Brach Family were real estate investors, with no day-to-day involvement in operating the nursing homes. Day-to-day management was handled by Zisha Lipschutz, who is the lead principal of a company called

Synergy Health Care, and the son of Larry Lipschutz.  The Brach Family currently are not members of the companies which operate each of the facilities.  The members of the operating companies are comprised of the Lipschutz family.

10.    In early 2016, Synergy found itself subject to bad publicity fueled by an unfortunate accident that occurred at the 90 West – Woodbriar facility, which was chronicled in the *Boston Globe*.  The adverse publicity and other factors hurt the nursing homes' referral networks and precipitated a drop in patient occupancy levels.

11.    For this and other reasons, in 2017 Synergy was replaced in part by Damien Dell'Anno and his company, Next Step Healthcare. Mr. Dell'Anno currently supervises all clinical services at the Debtors' facilities. Mr. Dell'Anno is a respected health care professional and has gained the confidence of the Lenders and the Brach Family.

12.    Mr. Dell'Anno has improved survey performance and helped increase patient occupancy levels, but there is still a long road ahead before the facilities can regain profitability. Complicating matters further, the skilled nursing home industry is undergoing fundamental structural changes in terms of competition from alternative sources of care, and tightening of state and federal reimbursements.

13.    Following Mr. Dell'Anno's retention, Synergy's role was confined to so-called "back-office" operations, which largely involves the processing and collection of customer billings and payment of vendor bills and payables.

14.    In recent weeks, the Brach Family has sought to replace Synergy entirely to eliminate Zisha Lipschutz from any day-to-day role whatsoever. Although Zisha Lipschutz's precise status is still under negotiation, given the fact that there needs to be a transition in the holders of the operating licenses, it suffices to say that the Brach Family have requested the

Receiver, KCP Advisory Group LLC, to assume back-office responsibilities for the facilities. This is illustrated by (i) the adequate protection stipulation submitted to the Court in the 90 West Chapter 11 case, a copy of which is annexed hereto as Exhibit "A", under which the Receiver is being continued without a right to sell the Properties, and the Brach Family has agreed to an initial advance of $100,000; and (ii) the collaborative order entered on March 21, 2018, relating to the Receivership for the Village Debtors, a copy of which is annexed hereto as Exhibit "B".

15.     The Debtors' long term intention is to retain a new back-office group entirely, known as Apex Rehabilitation & Healthcare ("Apex"). Apex is likewise highly experienced within the industry, and is known to the Lenders.

16.     Debtors' counsel, its Chief Restructuring Officer, Y.C. Rubin, and representatives of the Brach Family, visited many of the facilities to gain a clear sense of operations and economic needs. With the benefit of this visit, the Debtors are intent on developing a viable proposed for each of the Lenders to jump start the process. While much work remains to be done, the Debtors' good faith cannot be questioned, as the Brach Family has the necessary resources and commitment to address not only the mortgage debt, but also deal with a number of other claims and issues, while maintaining patient services.

## FACTUAL BACKGROUND

17.     90 West filed for Chapter 11 relief on January 30, 2018.  The Village bankruptcy cases were commenced by the filing of separate voluntary Chapter 11 petitions on February 14, 2018.  A motion for joint administration of the four Village Debtors was heard and approved on April 12, 2018.

18.     The Debtors are each real estate companies that own the real property (the "Properties") from which the affiliated entities (the "Non-Debtor Operating Entities") operate skilled nursing home facilities, summarized as below:

| Name of Debtor | Name of Facility and Address | Total Patient Bed Count | 2017 Facility Operating Revenues | Current Census |
|---|---|---|---|---|
| 90 West Street, LLC | Woodbriar Health Center 90 West Street, Wilmington, MA | 142 | $10,861,333 | 110 |
| 22 Maple Street, LLC | Merrimack Valley Health Center 22 Maple Street, Amesbury, MA | 130 | $9,802,633 | 102 |
| 25 Oriol Drive, LLC | Worcester Health Center 25 Oriol Drive, Worcester, MA | 160 | $11,319,648 | 146 |
| 59 Coolridge Road, LLC | Watertown Health Center 59 Coolidge Road, Watertown, MA | 163 | $11,598,914 | 132 |
| 20 Kinmonth Road, LLC | Waban Health Center 20 Kinmonth Road, Newton, MA | 88 | $6,307,462 | 79 |

19.     The Properties owned by the Village Debtors were acquired as part of a package in 2014 for more than $45 million. The purchase price was funded by capital contributions from the investors (mostly the Brach Family) and the loans made by the CF Lender and its participants in the original aggregate sum of $36,856,627. The CF Lender is the Agent for four syndicated banks. As of the Chapter 11 filing date, the principal balance had been reduced to approximately $31,110,090.97.

20.     The 90 West Property was acquired later in 2015 for approximately $22.0 million. The purchase price was funded by capital contributions from the investors (mostly the Brach Family) and the loans made by the Oxford Lender in the original aggregate sum of

approximately $18,000,000.  As of the Chapter 11 filing date, the principal balance owed to the Oxford Lender had been reduced to approximately $16,000,000.

21.     The value of the Debtors' properties is obviously tied to the success of the nursing homes themselves, which provide the sale source of revenue to service the mortgage debt. This is done through a so called "Op-Co/PropCo" lease structure under which the nursing homes are each a party to a lease agreement with the Debtors, and are obligated to pay rents in amounts sufficient to service the mortgage debt through lockbox arrangements.  The rents paid to the Debtors for debt service in 2017 are itemized as follows:

| Name of Debtor | Name of Facility and Address | 2017 Revenues from Rents |
|---|---|---|
| 90 West Street, LLC | Woodbriar Health Center 90 West Street, Wilmington, MA | $2,000,000 |
| 22 Maple Street, LLC | Merrimack Valley Health Center 22 Maple Street, Amesbury, MA | $841,035 |
| 25 Oriol Drive, LLC | Worcester Health Center 25 Oriol Drive, Worcester, MA | $1,050,000 |
| 59 Coolridge Road, LLC | Watertown Health Center 59 Coolidge Road, Watertown, MA | $1,050,000 |
| 20 Kinmonth Road, LLC | Waban Health Center 20 Kinmonth Road, Newton, MA | $560,000 |

22.     In recent years, the mortgage debt has been the subject to various forbearance agreements.  First, with respect to the Village Debtors, there were two prior forbearance agreements. The first forbearance agreement was signed on February 12, 2016 and a second forbearance agreement was signed on December 30, 2016. The second forbearance agreement lasted one year and expired on December 31, 2017.

23.     Under both forbearances, the Village Debtors remained current on monthly debt service despite the financial problems facing the nursing homes. The primary pre-petition default, which forms the basis of the foreclosure litigation with the CF Lender, involves a maturity default because the Second Forbearance Agreement expired on December 31, 2017 without renewal.

24.     Insofar as 90 West is concerned, it signed a forbearance agreement with the Oxford Lender in 2016, which also fell into default, largely because of the Oxford Debtor's inability to meet various financial commitments.  The Oxford Debtor nonetheless also remained current on debt service throughout 2017.

25.     Despite the Debtors' efforts to obtain additional forbearance agreements, the Oxford Lender and the CF Lender commenced foreclosure actions on November 9, 2017 and January 29, 2018 respectively (the "Foreclosure Actions").

26.     Although stayed as to the Debtors, the Foreclosure Actions have continued against the facilities themselves.  The Debtors do not necessarily see the intervention of the Receiver as a negative, but object to complete relief from the automatic stay to allow the secured creditors to sell or market any of the Properties.  There likely will come a time when the foreclosure proceeding need to be coordinated with the bankruptcies, but the hard negotiations and frameworks for a sale should occur in the context of the Chapter 11 cases.

### THE LENDERS HAVE NOT DEMONSTRATED
### SUFFICIENT CAUSE TO VACATE THE AUTOMATIC STAY

24.     The automatic stay affords fundamental protections to the Debtors under the Bankruptcy Code, and a necessary breathing spell for the Debtors to attempt to improve their financial situation toward the road of developing a viable plan of reorganization. *See, e.g., Midatlantic Nat'l Bank v. New Jersey Dep't of Envt'l Protection,* 474 U.S. 494, 503 (1986)

("The automatic stay provision of the Bankruptcy Code...has been described as one of the fundamental debtor protections provided by the bankruptcy laws.") (citations and internal quotations omitted).  Accordingly, the Motions cannot be analyzed in a vacuum, and these bankruptcy cases plainly transcend a simply foreclosure of real property, particularly when the debts relating to each of the nursing home operations are factored into the analysis.  Indeed, to state that these cases involve simple foreclosures is akin to describing *War and Peace* by just saying "Napoleon lost" – it is a gross oversimplification that ignores the larger context in which these cases must be placed.

25.    Besides mortgage debt, the Debtors directly, or indirectly, must address accrued Massachusetts bed taxes of approximately $1.8 million with respect to the Villages Debtors and approximately $1 million with respect to the Oxford Debtor, various real estate taxes, and the uncertainty arising out of a civil false claim investigation being pursued by the Department of Justice against Synergy and others regarding certain therapeutic services.  As of this date, there has been no determination of any wrongdoing on Synergy's part, but the probe overcharges the facilities.

26.    Many of the above obligations functionally, if not legally, prime the Lenders' mortgages in whole or in part, and will have to be address in any arms-length sale process.  For example, unless bed taxes are dealt with, Medicaid reimbursements can be interrupted.

27.    All of these matters can be addressed in Chapter 11 – but cannot necessarily be dealt with outside of bankruptcy since state law contains no analogue to Sections 363 and 365 of the Bankruptcy Code; no automatic stay and no mechanism to address multiple claims of creditors.

28.     Furthermore, the spectre of potential government claims impacts the ability of potential purchasers to obtain assignment of Medicaid/Medicare provider numbers. Disposition of these Medicaid/Medicare provider numbers also demands careful attention.

29.     In order for a creditor to be granted relief from the automatic stay, the creditor must make a showing that such relief is warranted in accordance with Section 362(d)(1), which provides, in relevant part, as follows:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> > (1)  for cause, including the lack of adequate protection of an interest in property of such party in interest . . . .

30.     "Cause" is not defined in the statute or the legislative history of the Bankruptcy Code, but is rather a fact-specific determination to be made by the court on a case-by-case basis. *See Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.),* 907 F.2d 1280, 1286 (2d Cir. 1990) (noting that the facts of each request to lift the stay will determine the appropriateness of such relief).

31.     Section 362(d)(1) places the initial burden of proving "cause" on the moving party. *In re Sonnax Indus., Inc., supra.,* 907 F.2d 1280, 1285 (2d Cir. 1990) ("Section 362(d)(1) requires an initial showing of cause by the movant, while Section 362(g) places the burden of proof on the debtor for all issues other than 'the debtor's equity in property', 11 U.S.C. § 362(g)(1). *See* 2 *Collier on Bankruptcy* ¶ 362.10, at 362-76. If the movant fails to make an initial showing of cause, however, the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection."); *see also, In re Elmira Litho, Inc.,* 174 B.R. 892, 902 (Bankr S.D.N.Y 1994) (The moving party must first establish a

prima facie case by establishing "a factual and legal right to the relief it seeks . . . before the debtor is obligated to go forward with its proof").

32.    The decision whether to vacate the automatic stay is committed to the sound discretion of the court, after considering "the particular circumstances of the case and ascertain[ing] what is just to the claimants, the debtor, and the estate." *In re M.J. & K Co., Inc.,* 161 B.R. 586, 590 (Bankr. S.D.N.Y. 1993), *quoting In re Mego Int'l, Inc.,* 28 B.R. 324, 326 (Bankr. S.D.N.Y. 1983).

33.    In determining if the movant has met its burden, the court should ascertain what is just with respect to the debtor, the estate, and the parties in interest. *In re Keene Corp.,* 171 B.R. 180, 183 (Bankr. S.D.N.Y. 1994).

34.    Here, each of the Lenders allege "cause" exists in the most conclusory terms, arguing directly or indirectly that the petitions were purportedly filed in bad faith merely because the Debtors own real estate that is subject to foreclosure proceedings, and the Debtors' allegedly have failed to provide adequate protection.   The Lenders have each failed to satisfy their burden on all accounts.

**A. The Lenders Have Failed to Demonstrate that it is Not Adequately Protected**

35.    The Debtors will first address the argument relating to adequate protection, as the analysis provides an excellent framework for the reviewing the balance of the Motions for stay relief.

36.    Without any analysis, let alone proof, the Lenders each contend that that are not adequately protected because (i) the Debtors have not yet commenced monthly payments; (ii) the Debtors lack income from which to make payments; and (iii) the Debtors do not have unencumbered assets from which to provide replacements liens to the Lenders.

37.     In making this argument, the Lenders confuse adequate protection with the provisions of Section 362(d)(3), requiring the commencement of monthly interest payments at the contract rate within 90 days of the commencement of bankruptcy, absent the filing of a reasonable plan or reorganization. To be sure, debt service has not yet resumed, although it is being discussed with the Receiver in the development of budgets.  In any event, the failure to pay debt service is not grounds to lift the automatic stay until at least expiration of the 90 day period, which ends on April 30, 2018 for 90 West and May 15, 2018 for the Village Debtors.

38.     By comparison, adequate protection, although synonymous with resumption of debt service, is effectively designed to protect a lender from the actual erosion in the value of its collateral during the pendency of a Chapter 11 case. *See, United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 370, 108 S. Ct. 626, 630 (1988) (noting that the secured creditor's collateral "is not adequately protected if the security is depreciating during the term of the stay."). Here, there is no evidence that the value of the Properties has eroded since the commencement of the bankruptcy cases, and therefore it cannot said that the Lenders are not adequately protected. To the contrary, the Brach Family is committed to maintaining the value of the Properties going forward, and thus even if the nursing homes cannot generate sufficient funds to pay rents, the Brach Family potentially can act as a back stop under a restructuring proposal.

39.     The fact that the Lenders are misguided in their respective analysis of adequate protection is symptomatic of their overall failure to make a proper showing necessary to carry the burden to lift the automatic stay.

40.     Case in point is the CF Lender's confusion as to the burden of proof Contrary to the CF Lender's Motion papers, the burden of proof on lack of equity in the

Debtors' Properties is squarely on the Lenders as the movants, and not the Debtors. Section 362(g) provides that:

> In any hearing under subsection (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section-
>
> 1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and
> 2) the party opposing such relief has the burden of proof on all other issues.

41.     It is telling that neither of the Lenders has provided any appraisals of the Properties, choosing instead to speculate on value.  This creates a hole in the Motions which must be filled before the Court can full dispose of the matter.

42.     Compounding their error, both Lenders miss the forest by looking at the trees, while ignoring the financial potential of the Brach Family to lead a stalking horse group to buy the Properties.  On top of the mortgage debt, the Brach Family is prepared to assume the tax liabilities, payment of real estate taxes, and create of a fund for unsecured creditors.

### B.  The Petitions were Filed in Good Faith

43.     The Lenders' claims of bad faith are likewise based on a narrow and myopic focus of the cases as a two party dispute.  Certainly there are two primary parties,  but this improperly minimizes the inter-relationship between the Debtors and the Non-Debtor Operating Entities, and the existence of significant other debts and claims, as well as the needs of close to 600 patients and a like number of employees.

44.     In making its bad faith claim, the CF Lender relies entirely upon *In re C-TC 9th Avenue Partnership,* 113 F.3d 1304 (2d Cir. 1997). First and foremost, *C-TC 9th Avenue* was not a relief from stay case, but rather a dismissal case under Bankruptcy Code § 1112. Courts have been clear that a finding of bad faith as justification to lift the automatic

14

stay öshould be used sparingly to avoid denying relief to statutorily eligible debtors except in extraordinary circumstances.ö *See, e.g., In re 234-6 West 22nd St. Corp.,* 214 B.R. 751, 757 (Bankr. S.D.N.Y. 1997). Here, no such extraordinary circumstances exist.

45.    As this Court recognized in *In re Consolidated Distributors, Inc.,* 2013 WL 3929851 *7 (Bankr. E.D.N.Y. 2013), the test for good faith/bad faith, as developed in *C-TC 9th Avenue,* combines an analysis of objective futility and subjective bad faith to determine whether, at the time of the filing, the debtor intended to reorganize and whether a reasonable chance exists for the debtor to emerge from bankruptcy.  *See also, In re 68 West 127th Street LLC,* 285 BR. 838, 846 (Bankr. S.D.N.Y. 2002) (Bad faith exists if it is clear on the filing date there is no reasonable likelihood that the debtor intended to reorganize and the debtor has no probability to emerge from bankruptcy); *In re Kingston Square Assocs.*, 214 B.R. 713, 725 (Bankr. S.D.N.Y. 1997) (ö[T]he standard in this Circuit is that a bankruptcy petition will be dismissed if *both* objective futility and subjective bad faith in filing the petition are found.ö (emphasis in original)); *In re RCM Global Long Term Corp. Appreciation Fund*, 200 B.R. 514, 520 (Bankr. S.D.N.Y. 1996) (öí   a Court should reach the conclusion that there is no demonstrable ability to reorganize only upon the strongest evidentiary showing.ö).

46.    The Court should also consider what the Debtors have <u>not</u> done.  The Debtors did not rush to file Chapter 11 petitions for the Non-Debtor Operating Entities, or seek to remove the foreclosure actions to this Court.  Instead, the Debtors have kept the Receiver in place, thus avoiding the prospect of a lengthy battle over jurisdiction and removal which would have sown confusion and concern about future operations.

47.    The Debtors and Mr. Dell'Anno are working cooperatively with the Receiver to maintain the proper level of services and care for the nursing home facilities and their patients.

48.    In the respective Motions, both Lenders characterize the foreclosure as a two-party dispute, and focus entirely on a mechanical ticking off of the list of factors identified in *C-TC 9th Avenue*, thereby overlooking the bigger picture – that the Debtors have serious proposals to restructure the mortgage debt and reorganize the Non-Debtor Operating Entities, without interrupting the care being provided to the patients.

49.    As this Court explained in *In re Consolidated Distributors, Inc.*, *supra.*, 2013 WL 3929851 at p. 7:

> In applying the *C–TC* factors, the Court will not "engage in a mechanical counting exercise" to determine whether the Debtor filed this bankruptcy case in bad faith. *See In re Century/ML Cable Venture*, 294 B.R. 9, 34 (Bankr.S.D.N.Y.2003). These factors are to be considered in the context of the totality of the circumstances and not in a vacuum. *In re R & G Properties, Inc.*, 2009 WL 1076703, at *3 (Bankr.D. Vt. April 16, 2009). No one factor is determinative of good faith and, "[i]t is the totality of circumstances, rather than any single factor, that will determine whether good faith exists." *In re Kingston Square Assocs.*, 214 B.R. at 725; see also *In re C–TC 9th Ave. P'ship*, 113 F.3d at 1312 (indicating that a finding of bad faith "requires a full examination of all the circumstances of the case" and is "a highly factual determination").

50.    In performing a good faith analysis, it is also important to bear in mind the comments by the Court in *In re Clinton Centrifuge, Inc.*, 72 B.R. 900, 905 (Bankr. E.D.Pa. 1987), which explained that:

> In engrafting the good faith requirement into the Code, courts must be careful not to upset the delicate balance of interests fashioned by Congress under chapter 11.  Moreover, to the extent that the concept of good faith exists independent of other Code provisions (such as adequate protection), courts must be vigilant to apply this concept in ways consistent with the legislative policy decisions embodied in these other [Code] enactments. Thus, in evaluating a debtor's good faith, the court's only inquiry is to

determine whether the debtor seeks to abuse the bankruptcy law by employing it for a purpose for which it was not intended. When a debtor is motivated by plausible legitimate reorganization (or liquidation) purposes and not solely or predominantly by the mere desire to prevent foreclosure or hinder creditors, bad faith is not present in a chapter 11 case.

51.     That the Lenders may be frustrated by the Chapter 11 filings is hardly bad faith. *See, In re Cohoes Industrial Terminal Inc.*, *supra*. 931 F.2d at 228 ("Filing a bankruptcy petition with the intent to frustrate creditors does not by itself establish an absence of intent to seek rehabilitation"). Indeed, the mere existence of pre-petition litigation is not a sufficient basis alone to support dismissal of a bankruptcy case. As one court found:

> The Creditor . . . has not proven by a preponderance of the evidence that the Debtor filed its chapter 11 case as a litigation tactic for the purpose of stalling the Creditor's state court rights, or to open the door for expanded legal sparring of state court issues in bankruptcy court. Its bad faith arguments are quite conclusory and, in the judgment of the Court, manifest its understandable "frustration" with the Debtor's bankruptcy filing rather than a showing of the Debtor's "abuse of judicial purpose." Simply checking off these factors on the list does not prove bad faith.

*In re R & G Properties, Inc.*, 2009 WL 1076703, at *2 (Bankr. D. Vt. Apr. 16, 2009)(internal citations omitted).

52.     In short, by applying the *C-TC 9th Avenue* factors without taking into account either the relationship of the Debtors with the Non-Debtor Operating Entities, or the demonstrated commitment of the Debtors' principals to restructure management and reorganize the financial affairs of the Debtors and the Non-Debtor Operating Entities, the Lenders' analyses is both shortsighted and severely flawed.

| Factor | Analysis |
|---|---|
| Factor 1: The debtor has only one asset | **Overlooks the interconnection with the Non-Debtor Operating Entities, which are the sole revenue source of the Properties and have value as well.** |

| Factor 2: The debtor has few unsecured creditors whose claims are small in relation to those of secured creditors | **Again overlooks the interconnection with the Non- Debtor Operating Entities, which have many tax and trade creditors that will need to be addressed** |
| --- | --- |
| Factor 3: The debtor's property is the subject of a foreclosure action due to a defaulted mortgage. | **The Properties are each subject to a pending foreclosure action.** |
| Factor 4:  The debtor's financial problems involve only a two-party dispute with the secured creditor. | **Again, by focusing solely on the Debtors, the Lenders overlook the interconnection with the Non-Debtor Operating Entities, and the existence of substantial additional creditors.** |
| Factor 5:  The timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the secured creditor to enforce its rights. | **In fact, the petitions were filed early in the foreclosure process, and not on the eve of sale after judicial determination of all issues. Moreover, the Debtors did NOT file corresponding petitions for the Non-Debtor Operating Entities to avoid delaying the foreclosure actions or otherwise having an negative impact on the facilities and their patient care.** |
| Factor 6:  The debtor has little or no cash flow. | **Rents due from the Non-Debtor Operating Entities can and should be paid.  Moreover, aa part of the restructuring/sale process, the Brach Family can advance funds to bridge operating losses.** |
| Factor 7: The debtor cannot meet current expenses, including payment of taxes. | **See Factor 6, above.** |
| Factor 8:  The Debtor has no employees. | **As with Factors 1 and 2, the CF Lender's narrow focus on the real property overlooks the significance of the Non-Debtor Operating Entities, which employ 500 to 600 people in the aggregate.** |

**C.  Viewed Through the Prism of the *Sonnax* Factors, the Court
Should also Reject all the Request to Vacate the Automatic Stay**

53.    The Lenders also try to apply the so-called "*Sonnax* factors" to argue that

the totality of the circumstances requires lifting the stay so that the foreclosures can continue.

However, a careful review of the *Sonnax* factors enunciated by the Second Circuit militates in

favor of keeping the automatic stay in place.  These factors include:

(1)  whether relief would result in a partial or complete
     resolution of the issues;
(2)  lack of any connection with or interference with the
     bankruptcy case;
(3)  whether the other proceeding involves the debtor as a
     fiduciary;
(4)  whether a specialized tribunal with the necessary
     expertise has been established to hear the cause of action;
(5)  whether the debtor's insurer has assumed full
     responsibility for defending it;
(6)  whether the action primarily involves third parties;
(7)  whether litigation in another forum would prejudice the
     interests of other creditors;
(8)  whether the judgment claim arising from the other action
     is subject to equitable subordination;
(9)  whether movant's success in the other proceeding would
     result in a judicial lien avoidable by the debtor;
(10) the interests of judicial economy and the expeditious and
     economical resolution of litigation;
(11) whether the parties are ready for trial in the other
     proceeding; and
(12) impact of the stay on the parties and the balance of
     harms.

*In re Sonnax Industries, Inc., supra,* 907 F.2d at 1286.

54.    Not all of these factors will be present in every case, nor are those that are

present given equal weight in a balancing of the equities.  *In re Enron*, 306 B.R. 465, 476

(Bankr. S.D.N.Y. 2004).  Generally, however, the Courts favor resolution of claim disputes

within the Chapter 11 process, absent a compelling reason to tip the scales in favor of lifting the

stay. *In re Bally Total Fitness of Greater N.Y., Inc.*, 411 B.R. 142, 148 (S.D.N.Y. 2009) ("The

automatic stay is entered in the first place, however, to ensure that a debtor can efficiently reorganize, and "to preserve [debtor's] property for distribution or for use in reorganization of the debtor."

55.    In this case, Factors 3, 5, 8 and 9 are not applicable to the foreclosure actions and do not support granting the Motion.  The remaining Sonnax Factors are discussed in detail below.

**Sonnax Factor 1:**
**(Vacating the Stay Would Not Finally Resolve All Issues)**

56.    Factor 1 relates to whether vacating the stay will completely or only partially resolve the dispute between the parties.  The Debtors submit that it clearly will not since there is no mechanism to maximize the value of the assets and protect all of the various constituent parties.

57.    In the foreclosure actions, the local courts can only fix the amount of the claim and proceed with a distressed foreclosure of the real property under likely arcane and cumbersome real estate statutes, or perhaps pursuant to Article 9 of the UCC.  This is a far cry from the multi-faceted features of the Bankruptcy Code and contains no provisions for treatment of other debts and obligations, and perhaps more importantly, no protections for more than 570 current patients.

58.    In comparison to the incomplete relief available under state law, this Court is far better positioned to determine the method to enforce the secured claims without doing damage to the value of the assets.  Indeed, these Chapter 11 cases present the best opportunity to obtain going concern value for the properties and facilities, using the protections and procedures of the Bankruptcy Code and Rules.  This will enable hundreds of people to retain jobs, and

provide continuing care for the patients, all while still opening a path for the payment of the

Lendersø secured claims. This kind of result simply cannot be achieved in foreclosure.

**Sonnax Factor 2:**
**(Confirmation of the Award is Directly Related to the Chapter 11 Case)**

59.     *Sonnax* Factor 2 addresses the extent of the relation between the action

and the bankruptcy case.   In describing the type of actions unrelated to the bankruptcy

proceeding so that stay relief might be warranted, Congress provided the following examples:

> [A] divorce or child custody proceeding involving the
> debtor may bear no relation to the bankruptcy case.  In that
> case, it should not be stayed.  A probate proceeding in
> which the debtor is the executor or administrator of
> anotherø estate usually will not be related to the
> bankruptcy case and should not be stayed.

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 343-44 (1977); S. Rep. No. 95-989, 95th Cong., 2d

Sess. (1978), *reprinted* in 1978 U.S.C.C.A.N. at 6300.

60.     In sharp contrast to these legislative examples, the fixing of the Lendersø

claims and subsequent disposition of the Debtorsø Properties is at the heart of the Chapter 11

cases, and the decisions on these issues should not be made elsewhere.  *See, In re WorldCom,*

*Inc.*, 2006 WL 2255071, at *9 (S.D.N.Y. Aug. 4, 2006)(*World Com I*) (õAs *Sonnax* factor two

indicates, the Bankruptcy Court is not only permitted, it is also expected to consider

õinterference with the bankruptcy caseö in determining whether to lift the injunction. *Sonnax,*

907 F.2d at 1286. The purpose of the [Section 1141] injunction, as well as the automatic stay, is

to allow the Bankruptcy Court to administer promptly the claims before it, a purpose which

would be undermined by constant disruption if separate claims before other courts were

permitted to continue until final resolution in the courts, particularly when the claims involve

issues of law easily disposed of by the Bankruptcy Court.ö).   Accordingly, Factor 2 plainly

favors denial of the Motions.

## Sonnax Factor 3
### (The Debtor is not a fiduciary)

61.    The Third Factor considers whether the debtor is a fiduciary.   As the

Second Circuit noted in *Sonnax*, the Senate Report comments directly on this factor, explaining

that:

> Generally, proceedings in which the debtor is a fiduciary . . .
> need not be stayed since they bear no real relationship to the
> purpose of the stay which is to protect the debtor and the
> estate from creditors.
>
> S.Rep. No. 989, 95th Cong., 2d Sess. 52, reprinted in 1978
> U.S.Code Cong. & Admin.News 5787, 5838.

*In re Sonnax Industries, Inc., supra*, 907 F.2d at 1285-1286.

62.    Here, the Debtors are not fiduciaries.   Thus, the third factor does not

support vacating the stay.

## Sonnax Factor 4
### (There is no need for a Specialized Court to Consider the Issues)

63.    Factor 4, considering whether the issues presented need to be tried in a

specialized court, also provides no support for the Motions.   The Lenders seek to vacate the stay

to continue the foreclosure actions.   Questions involving fixing claims and disposition of real

property are core bankruptcy functions (28 U.S.C. §157(b)(2)(B) and (N)), addressed in virtually

every real estate oriented Chapter 11 case.

64.    Nor does the fact that the CF Lendersø claims are governed by

Massachusetts law provide any support for the Motions to vacate the stay.   *See, e.g., In re*

*Worldcom, Inc.*, 2006 WL 2270379, at *10 (S.D.N.Y. Aug. 4, 2006)(*World Com II)* (õGrayson

argues that the issue involves "unclaimed property law" and as such, is "a matter exclusively of state law" and that, further, "the California court has expertise in applying California's UPL, which the bankruptcy court surely lacks." Grayson Br. at 36 (*citing Fucilo* 2002 WL 1008935 at *1). However, Bankruptcy courts are often called upon to apply state laws in resolving claims against the estate. Grayson fails to explain how the Bankruptcy Court abused its discretion in applying this factor or in determining that efficiency considerations weighed in favor of staying the state court action.").

65.    In any event, the Oxford loans are governed by New York law, and the Oxford Lender previously consented to the jurisdiction of the New York state or federal courts to hear disputes. *See*, Section 14.8 of the Term Loan and Security Agreement between the Oxford Lender and 90 West, a copy of Section which is annexed hereto as <u>Exhibit</u> "C".

### Sonnax Factor 5
### (There is no Insurance)

66.    Because there is no insurance coverage relating to the claim, this Factor does not support vacating the stay.

### Sonnax Factor 6
### (The State Court Action does not primarily concern third parties)

67.    This factor weighs whether the dispute primarily concerns third parties. The purpose behind this inquiry has been explained as follows:

> A court may lift a stay for actions which bear little relation to the bankruptcy case. See 2 Collier on Bankruptcy ¶ 362.07, at 362-50 (15th ed. 1982).  Such lack of connection with the title 11 case occurs where the action essentially involves third parties, the debtor functions only as a bailee or conduit for the goods or proceeds in question, and resolution of the issue in no way frustrates the orderly distribution of assets of the estate.

*In re Mego Intl, Inc.*, 28 B.R. 324 (Bankr. S.D.N.Y. 1983).

68.     As noted in the discussion of Factor 1, there is a strong relationship between the Debtors and other parties to the Foreclosure Actions, so that the Foreclosure Actions are not incidental to, but a substantial factor in these Chapter 11 cases.

69.     Notably, the Debtors are proceeding in a controlled fashion, taking measured steps designed to maintain the status quo as much as possible.  Thus, for example, at this time, the Debtors seek only to limit the stay to the Debtors to prevent distressed sale scenarios, in favor of a more fruitful process in Chapter 11.

70.     Through this course of action, the Lenders are not prejudiced, because the Debtors have consented to the continuation of the Receiver instead of invoking Section 543 to seek removal of the Receiver.  Accordingly, the parties are able to concentrate on efforts to restructure the debts and arrange for a fair going concern sale of the Facilities and Properties under the protections of Sections 363 and 1129, rather than engaging in substantial but peripheral litigation over removal, transfer and other procedural issues.

71.     Accordingly, the Debtors submit that this Factor likewise favors retaining the limited stay in effect, as a middle ground providing protections to all parties within unduly interfering with operations or efforts to market and sell the assets.

## Sonnax Factor 7
## (Prejudice to Other Creditors)

72.     Notwithstanding efforts by both Lenders to minimize the importance of the Debtorsø others creditors, there are, in fact, valid creditors whose interests should be considered when determining whether to permit the Lenders to proceed with a foreclosure, or afford the Debtors an opportunity to reorganize and market the Properties in a way that provide a recovery for all creditors and not just the Lenders.

73.     Moreover, the rights of the creditors of the Non-Debtor Operating Entities, as well as the patients being cared for at the Facilities must be considered under this Factor. Rushing to a sale of the real estate without dealing with the nursing home debts is counterproductive and will leave the Lenders with a substantial shortfall on their claims.

74.     For all of the reasons set forth above, it is far too early in the Chapter 11 process to vacate the stay and remove the prospect of a potential reorganization of the financial structure of the Facilities and the Properties.

**Sonnax Factor 8**
**(Equitable Subordination is not an Issue)**

75.     As there is no issue of equitable subordination of a claim, this Factor is not applicable and does not support vacating the stay.

**Sonnax Factor 9**
**(Confirmation of the Award will not lead to an Avoidable Judicial Lien)**

76.     This factor is also inapplicable and fails to support lifting the stay, because the avoidance of liens is not an issue.

**Sonnax Factors 10, 11 and 12**
**(Judicial Economy, the Status of the Litigation and the Balancing of Harms**
**Favor Resolving the Issues in Bankruptcy Court)**

77.     All parties in interest, the Village Debtors, 90 West, the Non-Debtor Operating Entities, the creditors, the patients, and even the Lenders, are best served by continuing the status quo while the Debtors pursues their efforts to at gaining the Lendersø agreement to a stalking horse bid/sale scenario.

78.     Simply proceeding to foreclosure will cause massive disruption to the care of the patients, and likely leave all other creditors without any monies to pay their claims.

79.    There is no judicial procedure available outside of bankruptcy for the sale of the Properties and the nursing homes as going concerns.  The sale of the Properties in foreclosure will not maximize the return on their value, and the only recourse with respect to the Facilities  is a UCC-9 foreclosure sale.  Good luck with that!

80.    On the other hand, continuing the measured steps being taken by the Village Debtors and 90 West offers the best chance to restructure all of the debts of all of the Properties and Facilities.

81.    In sum, most, if not all, of the twelve *Sonnax* factors militate against vacating the stay.

WHEREFORE, the Debtors respectfully pray for the entry of relief consistent with the foregoing, together with such other and further relief as is just and proper.

Dated:  New York, New York
        April 20, 2018

Goldberg Weprin Finkel Goldstein LLP
Attorneys for the Debtors
1501 Broadway, 21st Floor
New York, New York 10036
(212) 221-5700


By:   /s/ Kevin J. Nash, Esq.