KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, NY 10022-2585
Jeff J. Friedman
  and
525 West Monroe Street
Chicago, IL 60661
Kenneth J. Ottaviano
Paige B. Tinkham

*Counsel for Capital Funding, LLC*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
In re:

| | |
|---|---|
| **22 Maple Street, LLC,** | **Case No. 18-40816** |
| Debtor. | Chapter 11 |

-----------------------------------------------------------------x
In re:

| | |
|---|---|
| **25 Oriol Drive, LLC,** | **Case No. 18-40817** |
| Debtor. | Chapter 11 |

-----------------------------------------------------------------x
In re:

| | |
|---|---|
| **59 Coolidge Road, LLC,** | **Case No. 18-40818** |
| Debtor. | Chapter 11 |

-----------------------------------------------------------------x
In re:

| | |
|---|---|
| **20 Kinmonth Road, LLC,** | **Case No. 18-40819** |
| Debtor. | Chapter 11 |

-----------------------------------------------------------------x

**REPLY TO ZISHA LIPSCHUTZ'S OBJECTION TO AUTHORITY TO PROSECUTE**
**[D.I. 81]**

Capital Funding, LLC (the "Agent"), the agent for the secured lenders to each of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), hereby submits

this reply to the Objection to Authority to Prosecute ("Objection") filed by Zisha Lipschutz ("Mr. Lipschutz") and respectfully represents as follows:

1. Mr. Lipschutz's Objection should be overruled and the sale to the stalking horse bidder pursuant to the executed asset purchase agreement filed with the Court on September 7, 2018 [D.I. 80-1] (the "APA") should be approved by the Court.

2. Mr. Lipschutz's Objection sets forth various sale process objections, but in the end, Mr. Lipschutz agrees that a sale is appropriate and only asks for an additional sixty-day sale process. Mr. Lipschutz's Objection must be overruled because the Debtors do not have the financial wherewithal to survive a sixty-day delay in the sale process and Mr. Lipschutz offers no financial assistance to Debtors for his proposed delay. If Mr. Lipschutz objected to the Court's sale procedures that were approved on July 6, 2018, he should have brought the issue before the Court at that time. Even if he did not have an opportunity to timely object to the sale procedures motion, he had every opportunity to file a motion for reconsideration at that time. He did not. Instead, as discussed below, he used the sale process as a lever to delay the guarantor action against him. Mr. Lipschutz has waited too long to assert his sale process objections and now it is not financially feasible to delay the process.

3. Moreover, there is no need to delay the sale process. The sale process was conducted pursuant to the bid procedures already approved by the Court, the sale process was transparent and allowed for competitive bids. Mr. Lipschutz's claims of lack of authority for the bankruptcy filing and notice thereof are disingenuous and asserted only to pursue his goal to thwart recovery on his personal guaranty. He knew of the bankruptcy filings and appointment of Debtors' CRO (Mr. Rubin) from day one and even used the bankruptcy filings, and his involvement therein, as a reason to delay the guarantor action against him. He asserted in April

of 2018, under penalty of perjury, in a declaration to the United States District Court for the District of Maryland that he was "integral" to the bankruptcy court proceedings.  If the bankruptcy filings were truly not authorized by proper corporate authority, Mr. Lipschutz has had seven months to bring the issue before this Court.  He chose not to and instead chose to use the filings to his advantage.  The estates should not be harmed by his delay and tactics.  Moreover, even if the bankruptcy filings were nullified, the Debtors would be subject to receivership proceedings (which were filed before the bankruptcy filings).  The receiver in those proceedings supports the sale to the stalking horse bidder pursuant to the APA.

4.      In sum, Mr. Lipschutz's Objection is simply seeking delay in order to gain some concession from Agent on his personal guaranty.  He has asserted no valid reason to delay the sale (or to warrant any concessions related to his guaranty).  Mr. Lipschutz agrees that the properties should be sold and that Blueprint is a qualified broker to conduct the sale process.  He is only seeking a sixty-day delay in the process.  Moreover, Mr. Lipschutz did not file an objection to the sale of the facilities in the receivership court.  That objection deadline has already passed and the sale hearing is scheduled for Thursday, September 13.  It is clear, Mr. Lipschutz is only trying to disrupt the sale process to assert his personal agenda against the estate and such conduct should not be condoned.

## I.      The Debtors Do Not Have the Financial Wherewithal to Survive for Another 60 Days.

5.      The facilities operated on the Debtors' real property are in dire financial distress. The Debtors' cash flows are insufficient to meet their operating needs.  Since the filing of these bankruptcy cases, the stalking horse bidder has contributed $1 million to fund the facilities' payroll and payment of critical vendors because the facilities' cash flows were insufficient to cover these expenses.

6. The Debtors' financial picture is not forecasted to improve during the sixty-day period Mr. Lipschutz requests for an extended sale process. According to projections prepared by the receiver appointed over the facilities (the "Receiver") by the United States District Court for the District of Massachusetts (the "Mass. District Court"), at the end of the current thirteen-week cash flow forecast (the week of November 23, 2018), Debtors' net cash flow balance will be negative by over $700,000.

7. Under the APA, the stalking horse bidder agreed to pay all expenses and liabilities of Debtors after the auction and will be responsible for funding the Debtors' operations going forward. APA §7(b)(iii). The stalking horse bidder will not be using the facilities' accounts' receivable collections to fund the operations. The collection of accounts' receivable for the period prior to entry of the order approving the sale will be paid to the facilities' lenders to repay their secured loans. This agreement by the stalking horse bidder is a very important aspect of the stalking horse sale agreements because payment of these liabilities and expenses will permit the facilities to continue operating ensure continued care of the residents and begin immediate repayment to creditors.

8. In contrast, while Mr. Lipschutz requests a sixty-day delay in the sale process and claims to be an equity owner of the Debtors, he has offered no financial support for the Debtors during this period. Without financial support, the facilities and resident care will be jeopardized. The facilities simply do not have the ability to continue operating without financial support, especially not for the sole purpose of protecting Mr. Lipschutz from having to honor his personal guaranty.

9. Courts regularly approve sales when face with exigent circumstances, including the rapid deterioration of the debtors. *See, e.g.*, *In re Tempo Tech. Corp.*, 202 B.R. 363, 370 (D.

Del. 1996) (affirming expedited sale where there was only one buyer willing to negotiate a purchase, the debtor had a "severe cash flow predicament," and an "expedited sale was necessary to preserve the value of the Debtor's assets, in order to protect the interests of not only the Debtor, but its creditors as well."); *In re W/B Assocs.*, 226 B.R. 832, 835 (Bankr. W.D. Pa. 1998) ("An expedited sale process in bankruptcy is not an 'extraordinary' circumstance. In fact, expedited sales in bankruptcy are fairly frequent due to the exigencies of any particular case.") and *In re Boston Generating, LLC*, 440 B.R. 302, 323-330 (Bankr. S.D.N.Y. 2010) (approving sale where there was no likelihood of a plan being confirmed in near future, the debtors' would run out of cash if forced to continue operating, a sale transaction may not exist or be available at time of plan, the debtors' condition would "significantly deteriorate" in absence of a sale, and it was unlikely that a viable alternative to a sale would become available).

## II.   Mr. Lipschutz's Objection is Untimely: The Sale Process Was Conducted Pursuant to the Bid Procedures Already Approved by the Court.

10.   This Court entered the bid procedures order that Mr. Lipschutz is now complaining of on July 6, 2018. Instead of objecting to the actual sale of the assets to the stalking horse bidder, Mr. Lipschutz's objections are targeted on the sale process that was approved by this Court in the bid procedures order. Indeed, Mr. Lipschutz argues that (i) the length of the sale process was inadequate, (ii) the time period in which the sale process was conducted (the summer months) affected the bidding; and (iii) the amount of the break-up fee chilled bidding.

11.   If Mr. Lipschutz truly felt they would chill the bidding process, he had every opportunity to immediately raise such concerns. Instead, Mr. Lipschutz chose to capitalize on the sale process by requesting a stay of the guarantor action pending against him in the District of Maryland until the sale process was over and agreed he would not interfere with or impede the

very auction process he is now objecting to. *See* Joint Motion to Stay Litigation filed jointly by Mr. Lipschutz and Agent and corresponding order attached hereto as Exhibit A at ¶ 6.

**III.    The Sale Process Was Transparent and Allowed for Competitive Bids.**

12.    Blueprint Healthcare Real Estate ("Blueprint") was retained by the Debtors to conduct the sale process. In the Objection, Mr. Lipschutz admits that Blueprint is qualified to market the properties for sale. That admission is no surprise, because Mr. Lipschutz himself hired Blueprint just a few years ago to market the properties.

13.    Blueprint conducted the sale process pursuant the sale procedures approved by this Court. Blueprint contacted over 80 potential bidders, entered into over 45 non-disclosure agreements with potential bidders, established a dataroom with information regarding the properties and the facilities for the potential bidders and spent countless hours marketing the sale to potential bidders.

14.    Blueprint has confirmed to Agent that, based upon its general experience and its knowledge of this sale, the facilities and the properties: (i) the length of the sale process was adequate and a longer sale process would not promote additional bids higher than the stalking horse bid, (ii) conducting the sale of the facilities at a different time of year would not promote additional bids higher than the stalking horse bid; and (iii) the $200,000 break-up fee did not chill bidding.

15.    It is irreconcilable that Mr. Lipschutz asserts that a $460,000 break-up fee chilled the bidding. Mr. Lipschutz knows full well that the break-up fee was reduced to $200,000. Several weeks ago, Mr. Lipschutz asserted that he was interested in bidding, signed a non-disclosure agreement and obtained access to the dataroom used by the broker for interested bidders. The dataroom contained the executed APA, which clearly sets forth that, while the

Court originally approved a $460,000 break-up fee, the ultimate agreement, documented in the APA, was a lower break-up fee of $200,000.

16. In sum, the sale process was conducted pursuant to the bid procedures already approved by the Court, the sale process was transparent and allowed for competitive bids. Attempting to extend the sale process for another sixty-days will not promote additional bids.

**IV.    Mr. Lipschutz's Claims for Lack of Authority for the Bankruptcy Filing and Notice Thereof are Contrary to His Filings in Other Courts and Are Self-Serving.**

17. Mr. Lipschutz used the bankruptcy and receivership cases and his involvement therein as a reason to stay the guarantor action against him. In his affidavit in support of the stay request, Mr. Lipschutz certified, under penalty of perjury, on April 11, 2018, that:

> I am involved in many integral aspects of the reorganization of the debtor entities, including, but not limited to, being responsible for negotiating with creditors to reduce debt and fees owed and to formulate plans for repayment, acting as liaison for the entities to reduce Massachusetts State User Fees, and acting as the point-person in investigations being conducted by the Massachusetts Office of the Attorney General of some of the entities. I am also integral to resolving issues among current and potential investors.

Declaration of Zisha Lipschutz attached hereto as Exhibit B at ¶8. These bankruptcy cases had been pending for several months at that point. If Mr. Lipschutz truly felt that the filings were not authorized, he had every opportunity to raise the issue before this Court at that time. Instead, he chose to use the bankruptcy filings in his favor asking for a delay of guaranty action against him because he was "integral" to the reorganization process.

18. Mr. Lipschutz should be denied the right to now raise objections to the authority for the filing of these bankruptcy cases that he failed to assert in the months these bankruptcy cases have been pending.

19. Moreover, it is no excuse or justification to delay the sale that Mr. Lipschutz was not provided formal notice of some motions filed and orders entered by this Court. *See, e.g., In*

7

*re Torres*, 15 B.R. 794, 797 (Bankr. E.D.N.Y. 1981) (holding that "Creditors having actual knowledge of bankruptcy proceedings in time to protect their rights are afforded equal protection, though they did not receive mailed notices.... Even where formal notice to affected parties is omitted or is insufficient, informal or constructive notice which provides them with some opportunity for a fair hearing can satisfy procedural requirements." "Petitioner is a sophisticated lending institution, familiar with bankruptcy proceedings. Based on the knowledge that debtors had filed a petition in bankruptcy, a prudent creditor would be put on notice to make inquiries, notwithstanding the absence of formal notice. Petitioner, without good cause shown, chose to do nothing. Where petitioner had actual knowledge and failed to act, petitioner cannot now be heard to object to the lack of formal knowledge."); *In re DCA Dev. Corp.*, 489 F.2d 43, 47 (1st Cir. 1973) (finding "informal or constructive notice which provides [affected party] with same opportunity for a fair hearing" to be sufficient even where "formal notice to affected parties is omitted or insufficient.") and *In re Waters*, 22 B.R. 387, 388 (Bankr. N.D. Tex. 1982) (finding that creditor who did not receive formal notice but had actual notice and failed to object to exemptions could not file a late objection).

[Continued on Following Page]

WHEREFORE, the Agent respectfully requests that this Court overrule the Objection and approve the sale to the stalking horse bidder pursuant to the terms of the executed APA.

Dated: September 11, 2018                              Respectfully submitted;

By:   /s/ Paige B. Tinkham
Kenneth J. Ottaviano, (Admitted Pro Hac)
Paige B. Tinkham (Admitted Pro Hac)
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, Illinois 60661
Telephone: 312-902-5200
Facsimile: 312-902-1061
Kenneth.Ottaviano@kattenlaw.com
Paige.Tinkham@kattenlaw.com