EXHIBIT "A"

**ASSET PURCHASE AGREEMENT**

This **ASSET PURCHASE AGREEMENT** (this "APA" or "Agreement"), is made as of the ___ day of _____, 2018 (the "Effective Date"), by and between 20 Kinmonth Road, LLC (the "Seller") and Armando Petruzziello or nominee ("Purchaser").

WHEREAS, Seller owns the real property located at 20 Kinmonth Road, Newton, Massachusetts 02468 (the "Property");

WHEREAS, Seller granted Capital Funding, LLC a mortgage on its Property pursuant to those Mortgage and Security Agreements dated as of March 4, 2014 and that certain Loan Agreement dated as of March 4, 2014, as amended, restated, supplemented or otherwise modified from time to time, between each Seller and 20 Kinmonth Road, LLC as borrowers and Capital Funding, LLC as agent on behalf of the lenders ("Agent") and a lender and the other lenders (the "Lenders") thereto;

WHEREAS, the Property is leased by Seller to Waban Health Center, LLC ("Operator") that uses the Property as a skilled nursing facility (the "Facility");

WHEREAS, the Facility and the Operator are in the possession and control of a receiver, KCP Advisory Group, LLC (the "Receiver") pursuant to an order ("Receivership Order") entered on March 21, 2018, by the United States District Court for the District of Massachusetts ("Massachusetts Court") in Case No. 18-cv-10172-RWZ (the "Receivership Case");

WHEREAS, on February 14, 2018, Seller and three of its affiliates filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), which cases have been procedurally consolidated under Case No. 18-40816-NHL (the "Bankruptcy Case"), in the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court");

WHEREAS, Seller desires to sell and Purchaser desires to purchase the Property pursuant to the conditions set forth below and subject to the Bankruptcy Court's jurisdiction and oversight in the Bankruptcy Case (the "Property Sale");

WHEREAS, in accordance with this Agreement, Receiver intends to start a wind-down of the Facility;

WHEREAS, the execution and delivery of this Agreement, Seller's ability to consummate the transactions set forth in this Agreement, and Purchaser's obligations hereunder, are subject to the conditions set forth below, including entry of an order of the Bankruptcy Court (the "Bankruptcy Sale Order"), which is in form and substance acceptable to Purchaser (and may be deemed as part of an Order confirming the Seller's plan of reorganization), pursuant to, among other things, Bankruptcy Code section 363, authorizing and approving the sale of the Property to the Purchaser on the terms and conditions set forth herein, free and clear of the following: all liens, as defined in section 101(37) of the Bankruptcy Code ("Liens"); all claims, as defined in section 101(5) of the Bankruptcy Code ("Claims"); all interests, as defined in

1

section 363(f) of the Bankruptcy Code ("Interests"); and any and all liens, mortgages encumbrances affecting title.

NOW THEREFORE, in consideration of the mutual covenants and provisions herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby covenant and agree as follows:

1.    **Sale and Purchase of the Property; Assumption of Liabilities; Excluded Assets.** Property.   Subject to the provisions set forth herein the Seller hereby agree to sell, convey, assign, deliver and transfer to Purchaser, and Purchaser hereby agrees to purchase, acquire, and accept, free and clear of all Liens, Claims and Interests under section 363(f) of the Bankruptcy Code, and any and all liens, mortgages encumbrances affecting title:   (i) the representative Property consisting of that certain plot, piece or parcel of land located in Newton, Massachusetts, as more particularly described in **Exhibit A** hereto (the "Land"); (ii) all buildings and all other structures, facilities or improvements presently or hereafter located in or on the Land utilized by the Facility (the "Improvements"), (iii) all other fixtures attached or appurtenant to, located on or used in connection with the ownership, use, operation or maintenance of the Land and the Improvements (collectively, the "Fixtures"); and (iv) the land lying in the bed of any street or highway in front of or adjoining the Land to the center line thereof, if any.

(b)    Excluded Assets.   The following assets are not included in the Property Sale (the "Excluded Assets"): (i) Seller's rights arising under this Agreement or under any other agreement between Purchaser and Seller; (ii) all cash, cash equivalents, accrued rents, accounts receivable, pledges, contributions, donations, reserve account deposits, endowments, escrow accounts, or short-term investments as of the Closing Date; (iii) all rights to refunds from whatever source including, without limitation, for taxes, fees, assessments and charges and those arising out of retrospective premium adjustments under insurance policies covering the Property; (iv) all casualty, general liability and other insurance policies which cover the Seller, relating to the Property; (v) corporate organizational documents, minute books, tax records and seals; (vi) those rights relating to deposits and prepaid expenses and claims for refunds and rights to offset in respect thereof; (vii) the real property owned by 22 Maple Street, LLC; 25 Oriol Drive, LLC; 59 Coolidge Road, LLC and the skilling nursing facilities operated by Merrimack Valley Health Center, LLC; Watertown Health Center, LLC; and Worcester Health Center, LLC; (viii) any property owned by the Operator; (ix) claims for rent against the Operator, and (x) the items and assets set forth in Schedule 1(b).

2.    **Purchase Price; Closing Procedure.** Purchase Price.   The allocated purchase price (the "Purchase Price") for the Property shall be Four Million Two Hundred Fifty Thousand US Dollars ($4,250,000.00) (the "Purchase Price").   Each party agrees to complete jointly and file separately Form 8594 with its federal income tax return consistent with such allocation for the tax year in which the Closing occurs, and (y) that no party shall take a position on any income, transfer, gains or other tax return, or before any federal, state or local governmental or quasi-governmental authority or in any judicial proceeding that is in any manner inconsistent with the terms of any such allocation.

(b)    Payment of Purchase Price.   Payment of the Purchase Price shall be made as follows:

(i)     An earnest money deposit ("Deposit") in an amount of Twenty-Five Thousand US Dollars ($25,000.00) was deposited by Purchaser with Gulley & Straccia, PC (the "Gulley & Straccia") on October 16, 2018 and such deposit is being held by Gulley & Straccia in its IOLTA account.

(ii)    An additional earnest money deposit (the "Additional Deposit") in the amount of One Hundred Eighty-Seven Thousand and Five Hundred US Dollars ($187,500.00) shall be deposited by Purchaser with Gulley & Straccia as of the date of execution of this Agreement and shall be held by Gulley & Straccia in its IOLTA account.

(iii)   At Closing or such earlier time required by the title company selected to handle the sale transaction ("Title Company"), Purchaser shall deposit, with Title Company, an amount in immediately available funds, equal to the Purchase Price, *less* the Deposit and, *less* the Additional Deposit.

(c)     Closing Procedure.  Prior to the Closing Date, Purchaser and Seller shall provide to the Title Company instructions for the consummation of the sale of the Property, which instructions shall not conflict with any order of the Bankruptcy Court.   Provided that all conditions to the Closing (as defined below) set forth in this Agreement have been satisfied or waived by the party intended to be benefited thereby, on the Closing Date (as defined below), the Title Company shall conduct the Closing by recording or distributing the following documents and funds in the following manner:

(i)     Record the Deed (as hereinafter defined) in the official records of the county in which the Lands are located;

(ii)    Deliver to Purchaser all documents that are required to be delivered by Seller to Purchaser pursuant to Section 5(a) hereof (to the extent the same shall be delivered to Title Company at or prior to the Closing);

(iii)   Deliver to Seller all documents that are required to be delivered by Purchaser to Seller pursuant to Section 5(b) hereof (to the extent the same shall be delivered to Title Company at or prior to the Closing); and

(iv)    Wire the Purchase Price to Seller.

3.      **Time and Placing of Closing.** Unless otherwise agreed in writing by Seller, Purchaser and Agent, the consummation of the Property Sale (the "Closing") shall take place at the offices of Gulley & Straccia, PC, or by exchange of signed documents sent as "pdf" or similar files attached to emails, on or before (the "Closing Date") the first business day after all of the following events have occurred: (i) forty-five (45) days after the execution of this Agreement, (ii) all residents of the Facility have been discharged from the Property; and (iii) the Bankruptcy Court has entered a final order approving the sale.  Unless otherwise agreed by the Parties in writing, the Closing shall be deemed effective and all right, title, and interest of Seller to be acquired by Purchaser hereunder shall be considered to have passed to Buyer as of 12:01 a.m. (Eastern Time) on the Closing Date.

4.      **Title, Deed.**

(a)      Said Premises are to be conveyed by a good and sufficient Warranty Deed, in substantially the form annexed hereto as **Exhibit B** (the "Deed"), running to the BUYER, or to the nominee designated by the BUYER by written notice to the SELLER at least seven (7) days before the deed is to be delivered as herein provided, conveying pursuant to the terms of the Bankruptcy Sale Order, good, clear, insurable, marketable and insurable title, free and clear of all encumbrances, mortgages, liens, charges, restrictions, or any other imperfections of title whatsoever, except (a) provisions of existing building and zoning laws; (b) existing rights and obligations in party walls which are not the subject of written agreement; (c) such taxes for the then current year as are not due and payable on the date of the delivery of such deed; (d) any liens for municipal betterments assessed after the date of this agreement; (e) easements, restrictions and reservations of record, if any, so long as the same do not prohibit or materially interfere with the contemplated use of the premises. If BUYER maintains that any easements, restrictions or reservations of record prohibit or materially interfere with the contemplated use of the premises, it shall inform SELLER of such encumbrances no later than thirty (30) days before the Closing Date.

(b)      If on the Closing Date the SELLER shall be unable to give title or to make conveyance, or to deliver possession of the Premises, all as herein stipulated, or if at the time of the delivery of the deed the Premises do not conform with the provisions hereof, then the SELLER shall use reasonable efforts to remove any defects in title, or to deliver possession as provided herein, or to make the said Premises conform to the provisions hereof, as the case may be, in which event the SELLER shall give written notice thereof to the BUYER at or before the time for performance hereunder, and thereupon the time for performance hereof shall be extended for a period of thirty (30) days or such shorter time as is necessary to deliver the Premises in compliance with the terms hereof. If at the expiration of the extended time the SELLER shall have failed so to remove any defects in title, deliver possession, or make the premises conform, as the case may be, all as herein agreed, then any payments made under this agreement shall be forthwith refunded and all other obligations of the parties hereto shall cease and this agreement shall be void without recourse to the parties hereto.

5.      **Due Diligence and "As Is-Were Is" Sale.**  Due Diligence.  Purchaser may conduct due diligence until November 30, 2018 (the "Due Diligence Period").  Unless extended by mutual agreement of the parties, following the Due Diligence Period, Purchaser may continue conducting due diligence, but the results thereof shall not be a condition to Closing the transaction set forth in this Agreement or a basis for terminating this Agreement. Property Conveyed "As Is-Where Is".

(i)      "As Is-Where Is." Except as otherwise expressly set forth in this Agreement, PURCHASER SHALL ACCEPT THE PROPERTY IN AN "AS-IS" AND "WHERE-IS" CONDITION AS OF THE CLOSING, WITH ALL FAULTS AND DEFECTS NOW KNOWN OR HEREAFTER DISCOVERED BY PURCHASER, AND PURCHASER AGREES THAT, OTHER THAN AS AND TO THE EXTENT EXPLICITLY PROVIDED IN THIS AGREEMENT, SELLER HAVE NOT AND DO NOT MAKE ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, TO PURCHASER REGARDING THE PROPERTY (INCLUDING, WITHOUT LIMITATION, (I) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS CURRENT OR

INTENDED OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY (INCLUDING WITHOUT LIMITATION, THE FEDERAL COMPREHENSIVE ENVIRONMENTAL RESPONSE COMPENSATION AND LIABILITY ACT OF 1980, AS AMENDED (42 U.S.C. SECTION 9601 ET SEQ.) ("CERCLA"), AND OTHER ENVIRONMENTAL LAWS (AS HEREINAFTER DEFINED), RULES OR REGULATIONS) AND ANY CLAIMS MADE OR OBLIGATIONS OR LIABILITIES IMPOSED PURSUANT THERETO, AS WELL AS ANY ZONING ORDINANCES, AND/OR APPLICABLE BUILDING, SAFETY, FIRE, AND/OR HOUSING CODE REQUIREMENTS, (II) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY, (III) THE MANNER, QUALITY, STATE OF REPAIR, OR LACK OF REPAIR, OF THE PROPERTY, (IV) THE PRESENCE OR ABSENCE OF HAZARDOUS MATERIALS AT, ON, UNDER, OR ADJACENT TO THE PROPERTY, OR ANY OTHER ENVIRONMENTAL MATTER OR CONDITION OF THE PROPERTY, AND (V) ANY OTHER MATTER WITH RESPECT TO THE CONDITION OF THE PROPERTY), THE CONDITION OF THE PROPERTY OR THE FITNESS OR SUITABILITY OF THE PROPERTY FOR ANY INTENDED OR PARTICULAR USE, ANY TAX CONSEQUENCES, FAVORABLE OR OTHERWISE, RESULTING FROM PURCHASER'S ACQUISITION OR OPERATION OF THE PROPERTY, THE VALUE, NATURE, OR QUALITY OF THE PROPERTY, THE STRUCTURAL INTEGRITY, SOIL, AND GEOLOGY OF THE PROPERTY, ANY REPRESENTATIONS OF SELLER DEEMED MADE BY LAW, AND/OR ANY OTHER MATTER WITH RESPECT TO, OR THAT MIGHT AFFECT, THE PROPERTY OR THE VALUE, REPAIR, EXPENSE OF OPERATION, INCOME POTENTIAL, OR OTHER CONDITION OF THE PROPERTY, IT BEING UNDERSTOOD AND AGREED BY PURCHASER THAT ANY AND ALL SUCH REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, BEING HEREBY EXPRESSLY WAIVED BY PURCHASER AND DISCLAIMED BY SELLER. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, PURCHASER ACKNOWLEDGES THAT, EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT (AND IN THE DOCUMENTS TO BE DELIVERED BY SELLER TO PURCHASER AT CLOSING), NO REPRESENTATION, WARRANTY, UNDERTAKING, AGREEMENT OR PROMISE, WHETHER EXPRESS OR IMPLIED OR OTHERWISE, HAS BEEN MADE BY SELLER OR SELLER'S AFFILIATES AND THEIR RESPECTIVE MEMBERS, SHAREHOLDERS, PARTNERS, OFFICERS, AGENTS, DIRECTORS, EMPLOYEES, ATTORNEYS AND CONTRACTORS (COLLECTIVELY, "SELLER RELATED PARTIES") OR AGENT TO PURCHASER WITH RESPECT TO THE PROPERTY, INCLUDING BUT NOT LIMITED TO, THE SIZE, USE OR TYPE OF LAND, ANY FINANCIAL INFORMATION PERTAINING TO THE OWNERSHIP OR OPERATION OF THE PROPERTY, THE CURRENT OR PRIOR FINANCIAL STATUS, MANAGEMENT OR CONDITION OF THE PROPERTY OR ANY OTHER MATTER. EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT (AND IN THE DOCUMENTS TO BE DELIVERED BY SELLER TO PURCHASER AT CLOSING), PURCHASER WAIVES ANY CLAIM THAT MAY EXIST AGAINST SELLER OR ANY SELLER RELATED PARTIES OR AGENT FOR PATENT AND/OR LATENT DEFECTS. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, PURCHASER ACKNOWLEDGES THAT, EXCEPT AS SPECIFICALLY SET FORTH HEREIN (AND IN THE DOCUMENTS TO BE DELIVERED BY SELLER TO PURCHASER AT CLOSING), NEITHER SELLER NOR ANY

SELLER RELATED PARTIES HAVE MADE, AND HEREBY MAKE, NO REPRESENTATION OR WARRANTY PERTAINING TO THE PROPERTY WITH RESPECT TO (I) THE TOTAL AREA OF THE REAL PROPERTY OR ANY IMPROVEMENTS; (II) THE NATURE OF THE SOIL ON AND UNDERLYING THE REAL PROPERTY OR ITS SUITABILITY FOR DEVELOPMENT OR ANY OTHER USE THEREOF; (III) COMPLIANCE OR NON-COMPLIANCE OF THE PROPERTY WITH ENVIRONMENTAL LAWS OR REGULATIONS; (IV) THE PRESENCE OR ABSENCE OF HAZARDOUS OR TOXIC SUBSTANCES; (V) THE VALUE, NATURE, QUALITY OR PHYSICAL CONDITION OF THE PROPERTY; (VI) INCOME DERIVED FROM THE PROPERTY; (VII) MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS OF THE PROPERTY FOR A PARTICULAR PURPOSE; (VIII) COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY GOVERNMENTAL AUTHORITY OR BODY; (IX) MANNER OR QUALITY OF CONSTRUCTION OR MATERIALS INCORPORATED INTO THE PROPERTY; (X) MANNER, QUALITY STATE OR REPAIR OR LACK OF REPAIR OF THE PROPERTY; (XI) THE ENVIRONMENTAL CONDITION OF THE PROPERTY; OR (XII) ANY OTHER MATTER REGARDING THE PROPERTY, INCLUDING, WITHOUT LIMITATION, ANY MODIFICATIONS TO THE PROPERTY AND SELLER EXPRESSLY DISCLAIM EACH AND EVERY SUCH REPRESENTATION AND WARRANTY.

   (ii) "Hazardous Substances" or "Hazardous Materials" shall mean (i) hazardous wastes, hazardous materials, hazardous substances, hazardous constituents, toxic substances or related materials, whether solids, liquids or gases, including, but not limited to, substances defined as "hazardous wastes," "hazardous materials," "hazardous substances," "toxic substances," "pollutants," "contaminants," "radioactive materials", "toxic pollutants", or other similar designations in, or otherwise subject to regulation under, CERCLA; the Toxic Substance Control Act, 15 U.S.C. § 2601 et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. § 1802; the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, et seq.; the Clean Water Act, 33 U.S.C. § 1251 et seq.; the Safe Drinking Water Act, 42 U.S.C. § 300f et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; and in any permits, licenses, approvals, plans, rules, regulations or ordinances adopted, or other criteria and guidelines promulgated pursuant to the preceding laws or other similar federal, state or local laws, regulations, rules or ordinance now or hereafter in effect relating to environmental matters (collectively, "Environmental Laws"); and (ii) any other substances, constituents or wastes subject to any applicable federal, state or local law, regulation or ordinance, including any environmental law, now or hereafter in effect, including but not limited to (A) petroleum, (B) refined petroleum products, (C) waste oil, (D) waste aviation or motor vehicle fuel and their byproducts, (E) asbestos, (F) lead in water, paint or elsewhere, (G) radon, (H) Polychlorinated Biphenyls (PCBs), (I) urea formaldehyde, (J) volatile organic compounds (VOCs), (K) total petroleum hydrocarbons (TPH), (L) benzene derivative (BTEX), (M) petroleum byproducts and (N) any form of mold.

   (iii) RELEASE. PURCHASER REPRESENTS TO SELLER THAT PURCHASER HAS CONDUCTED, OR WILL CONDUCT PRIOR TO EXECUTION OF THIS AGREEMENT, SUCH INVESTIGATIONS OF THE PROPERTY AS PURCHASER DEEMS NECESSARY OR DESIRABLE TO SATISFY ITSELF AS TO ANY MATTER RELATING TO THE PROPERTY. UPON CLOSING, EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT (AND IN THE DOCUMENTS TO BE DELIVERED BY

SELLER TO PURCHASER AT CLOSING), PURCHASER SHALL ASSUME THE RISK THAT ADVERSE MATTERS REGARDING THE PROPERTY MAY NOT HAVE BEEN REVEALED BY PURCHASER'S INVESTIGATIONS, AND PURCHASER, UPON CLOSING, SHALL BE DEEMED, ON BEHALF OF ITSELF AND ON BEHALF OF ITS TRANSFEREES AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS (INCLUDING, WITHOUT LIMITATION, ANY AFFILIATE OR NOMINEE OF PURCHASER AS PROVIDED HEREIN), TO WAIVE, RELINQUISH, RELEASE AND FOREVER DISCHARGE SELLER, SELLER'S AFFILIATES AND THEIR RESPECTIVE MEMBERS, MANAGERS, PARTNERS, SHAREHOLDERS, OFFICERS, AGENTS, ATTORNEYS, DIRECTORS AND EMPLOYEES AND AGENT FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION, LOSSES, DAMAGES, LIABILITIES, COSTS AND EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES) OF ANY AND EVERY KIND OR CHARACTER, KNOWN OR UNKNOWN, BY REASON OF OR ARISING OUT OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, A LATENT OR PATENT CONSTRUCTION DEFECT OR OTHER PHYSICAL CONDITION (INCLUDING, WITHOUT LIMITATION, FUNGI, MOLD OR MILDEW) WHETHER PURSUANT TO STATUTES IN EFFECT IN THE STATE OF NEW YORK OR ANY OTHER FEDERAL, STATE OR LOCAL ENVIRONMENTAL OR HEALTH AND SAFETY LAW OR REGULATION; THE EXISTENCE OF ANY HAZARDOUS MATERIAL WHATSOEVER, ON, AT, TO, IN, ABOVE, ABOUT, UNDER, FROM OR IN THE VICINITY OF THE PROPERTY; AND ANY AND ALL OTHER ACTS, OMISSIONS, EVENTS, CIRCUMSTANCES OR MATTERS WHATSOEVER REGARDING THE PROPERTY.

(c)     Title, Survey and Other Charges. Purchaser may, at its expense, purchase a title commitment for an ALTA owner's title insurance policy and any endorsements thereto, a survey of the Property.  Purchaser shall also be responsible for the cost of any recording fees with respect to recording the deed and clearing public records of items related to the Property. Purchaser shall prepare and provide to Capital Funding, LLC all proposed releases and terminations of the Liens and Encumbrances filed by Capital Funding, LLC.

(d)     Permitted Executions.  As used in this Agreement, the term "Permitted Exceptions" shall mean and include (1) real estate taxes and assessments not due and payable on the date of Closing, (2) building and other set back lines and zoning requirements and restrictions, (3) utility easements and utility lines serving the Improvements on the Property, (4) rights of way of public streets, roadways and alleys, and (5) any other liens and encumbrances accepted by Purchaser hereunder.

6.     **Conditions to Closing.** Purchaser's Conditions.   Purchaser's obligation to consummate the transactions contemplated in this Agreement and accept title to the Property shall be subject to the following conditions precedent or the waiver thereof by Purchaser:

(i)     Possession of the Property shall be delivered to Purchaser free and clear of all tenancies and other occupancies (including all occupancy rights of any residents of the Facility) and all residents of the Facility shall have been discharged from the Facility;

(ii) Possession of the Property shall be delivered to Purchaser free and clear of all claims for service, maintenance, repair, management, leasing, or supply contracts or other contracts affecting the Premises;

(iii) Possession of the Property shall be delivered to Purchaser free and clear all liens affecting title as set forth in the Bankruptcy Sale Order, specifically including, but not limited to the following:

(1) Mortgage and Security Agreement from 20 Kinmonth Road, LLC to Capital Funding, LLC, in the original principal amount of $36,856,627.00, recorded March 7, 2014 with Middlesex Southern District Registry of Deeds in Book 63346, Page 388, as affected by Subordination and Attornment Agreement dated as of March 4, 2014 among Capital Funding, LLC, 20 Kinmonth Road, LLC and Waban Health Center, LLC, recorded March 7, 2014 with such Registry in Book 63346, Page 432.

(2) Terms, conditions, covenants, agreements and assignments of rights of Assignment of Rents and Leases by 20 Kinmonth Road, LLC to Capital Funding, LLC, recorded March 7, 2014 with Middlesex Southern District Registry of Deeds in Book 63346, Page 419, as affected by Subordination and Attornment Agreement dated as of March 4, 2014 among Capital Funding, LLC, 20 Kinmonth Road, LLC and Waban Health Center, LLC, recorded March 7, 2014 with such Registry in Book 63346, Page 432.

(3) Lien of UCC Financing Statement naming 20 Kinmonth Road, LLC as Debtor and Capital Funding, LLC as Secured Party, recorded March 7, 2014 with Middlesex Southern District Registry of Deeds in Book 63346, Page 444.

(4) Lien of UCC Financing Statement naming Waban Health Center, LLC as Debtor and Capital Funding, LLC as Secured Party, recorded March 7, 2014 with Middlesex Southern District Registry of Deeds in Book 63346, Page 452.

(5) Lien for payments due from time to time to the Brae Burn Country Club from 20 Kinmonth Road, LLC, as set forth in Easement Agreement recorded November 18, 2016 with Middlesex Southern District Registry of Deeds in Book 68428, Page 217.

(6) Terms, conditions, covenants, agreements and lien of Mortgage from 20 Kinmonth Road, LLC to Capital Funding, LLC, in an unspecified amount, recorded February 15, 2017 with Middlesex Southern District Registry of Deeds in Book 68895, Page 273.

(7) A 1989 $1,000,000.00 mortgage (20196/242) and Conditional Assignment of Rents (20196/250), by prior owners Linda Franchi, *et als.*, Trustees of Kinmonth Realty Trust, as affected by a Subordination, Non-Disturbance and Attornment Agreement among the Borrower and Lender thereof and the then-tenant of locus, Brae Burn Nursing Home, Inc. (20268/300) remain undischarged and unreleased of record.

(iv) All taxes and other assessments (including without limitation all permit, connection, and hookup fees) that are due on or before the Closing have been paid in full.

To Seller's knowledge, there are no existing, proposed or contemplated (i) special assessments, or (ii) condemnation actions against the Premises or any part, and Seller has not received notice of any contemplated special assessments or eminent domain proceedings that would affect the Premises.

(v)    Seller shall have delivered to Title Company, on or before the Closing Date the following, each of which shall be in form and substance required herein or as otherwise reasonably satisfactory to Purchaser:

(1)    the Deed;

(2)    any affidavit of title and such other affidavits as may be required by the Title Company in connection with the conveyance of the Property;

(3)    copies of all licenses, permits, certificates of occupancy and accreditations issued by any federal, state, municipal or local governmental authority relating to the occupancy or ownership of the Property running to, or in favor of, Seller, to the extent legally assignable (including all modifications thereto or renewals thereof) (collectively, the "Permits");

(4)    a complete set of keys for the Property, appropriately tagged for identification;

(5)    the General Assignment Agreement in substantially the form annexed hereto as **Exhibit C**;

(6)    the Foreign Investment in Real Property Tax Act affidavit in substantially the form annexed hereto as **Exhibit D**;

(7)    a form 1099 identifying Seller's gross proceeds and Seller's tax identification number, as required by the Title Company; and

(8)    such other customary closing documents required by the Title Company, as applicable, including any real estate transfer tax forms.

(vi)    The representations and warranties of Seller contained in this Agreement shall be true and complete in all material respects as of the Closing Date.

(vii)    Seller obtained entry of the Bankruptcy Sale Order, granting and providing, among other things, and subject to the Closing, that (i) the conveyance of the Property, to the fullest extent permitted by the Bankruptcy Code, pursuant to Sections 105, 363(b) and 363(f) of the Bankruptcy Code, is free and clear of all Claims, Liens and Interests, other than Permitted Exceptions; (ii) Purchaser is deemed to have purchased the Property in good faith pursuant to Section 363(m) of the Bankruptcy Code and that the provisions of section 363(n) of the Bankruptcy Code have not been violated; (iii) Seller is authorized and directed to execute, upon request by Purchaser, one or more conveyance documents in form, substance, and number reasonably acceptable to Seller, evidencing the conveyance of the Property to Seller.

(viii)   The entered Bankruptcy Sale Order shall not have been reversed, stayed, vacated, modified or amended without the prior written consent of the Seller.

(b)   <u>Seller's Conditions</u>.   Seller's obligation to consummate the transactions contemplated in this Agreement and accept title to the Property shall be subject to the following conditions precedent or the waiver thereof by Seller:

(i)   Purchaser shall have delivered to Title Company, on or before the Closing Date the following, each of which shall be in form and substance required herein or as otherwise reasonably satisfactory to Seller:

(1)   certificates of a duly authorized officer of Purchaser or of its managing constituent, dated the Closing Date, to the effect that (A) Purchaser has been duly organized and is validly existing in good standing under the laws of the State of Massachusetts and is authorized to do business in the State in which the Property are located, (B) Purchaser has all requisite power and authority to perform the terms of this Agreement;

(2)   counterpart signature pages to this Agreement and each of the Other Documents as applicable, duly executed and acknowledged by Purchaser, as and to the extent herein provided;

(3)   the Closing Note;

(4)   the General Assignment Agreement in substantially the form annexed hereto as **Exhibit C**; and

(5)   the payment required under <u>Section 2</u>.

(ii)   The representations and warranties of Purchaser contained in this Agreement shall be true and complete in all material respects as of the Closing Date.

(iii)   The Bankruptcy Court shall have entered the Bankruptcy Sale Order in form and substance acceptable to Seller in its discretion, and as of the Closing, the Bankruptcy Sale Order shall not have been reversed, stayed, vacated, modified or amended.

(c)   <u>Conditions Generally</u>.   The foregoing conditions are for the benefit only of the party for whom they are specified to be conditions precedent and such party may, in its sole discretion, waive any or all of such conditions and proceed with the Closing under this Agreement.  Notwithstanding anything to the contrary set forth in this Agreement, if Purchaser and Seller close the transaction contemplated herein despite any conditions precedent remaining unsatisfied, then Purchaser and Seller, as applicable, shall be deemed to have waived any right to object to Closing with respect to such unsatisfied conditions precedent, and no additional written document to such effect shall be required.  In the event that either of the parties hereto (a "<u>Waiving Party</u>") waives a condition precedent to its performance hereunder, or otherwise elects to proceed with the Closing despite the fact that one or more conditions precedent to its performance have not been satisfied, such action by the Waiving Party shall in no way be deemed a waiver of any payment, indemnification or other rights of the Waiving Party with

respect to such condition, and the Waiving Party shall be entitled, following the Closing, to pursue any and all available remedies at law or equity with respect thereto.

7. **Apportionments; Post-Closing.**Insurance Policies. Unless otherwise agreed, no insurance policies of Seller are to be transferred to Purchaser, and no apportionment of the premiums therefor shall be made, in which event, Purchaser shall be responsible for securing its own insurance for the Property.

(b) Survival. The obligations of the parties hereto under this Section 6 shall survive the Closing.

8. **Pre-Closing Covenants.**Seller's Covenants. Seller hereby agrees and covenants to Purchaser that prior to the Closing Date, except as otherwise contemplated by this Agreement or with the prior written consent of Purchaser, Seller shall: (i) maintain the Property in substantially the same condition as it existed on the Effective Date, normal wear and tear excepted; (ii) maintain its current insurance policies in full force and effect; (iii) during normal business hours and upon reasonable prior notice or at any time within forty-eight hours prior to the Closing, permit Purchaser and its representatives to inspect the Property, and to examine Seller's books and records relating to the ownership, construction, use, occupancy, management, operation and maintenance of the Property, including, without limitation, any environmental reports, and/or information in Seller's possession, care, custody or control, that Seller, or Seller's agents may possess with regard to the presence or absence of any hazardous materials/substances, including, but not limited to asbestos, mold and other hazardous substances. Wherever Seller's consent is required hereunder, such consent shall not be unreasonably withheld, conditioned, or delayed.

(b) General Joint Covenants. Each party hereto agrees and covenants to use its commercially reasonable efforts to cause the conditions to its obligations and to each other party's obligations herein set forth to be satisfied at or prior to the Closing Date. Each party shall promptly notify the other party of any information delivered to or obtained by such party which would impair or prevent the consummation of the transactions contemplated hereby. Each of the parties hereto agrees to execute and deliver any further agreements, documents or instruments necessary to effectuate this Agreement and the transactions referred to herein or contemplated hereby or reasonably requested by the other party to perfect or evidence their rights hereunder, whether prior to or following the Closing Date, at no cost, expense or liability to the providing party.

9. **Seller's Representations and Warranties.**Representations and Warranties. Seller hereby make the following representations and warranties to Purchaser:

(i) Exclusivity. Seller shall deal exclusively with Purchaser and shall not accept other offers or negotiate with other purchasers of the Property until the earlier of (i) expiration of the Due Diligence Period and (ii) termination of this Agreement.

(ii) Non-Foreign Status. Seller is a "non-foreign person" within the meaning of Section 1445 of the United States Internal Revenue Code of 1986, as amended, and the regulations issued thereunder.

(iii)   <u>Special Assessments</u>. To the best of Seller's knowledge, there are no (i) pending or threatened special assessments affecting the Property or (ii) any contemplated improvements affecting the Property that may result in special assessments affecting the Property.

(iv)   <u>Access to Property</u>. To the best of Seller's knowledge, there are no federal, state, county, municipal or other governmental plans to (i) change the highway or road system directly adjacent to the Property, or (ii) restrict or change access from any such highway or road to the Property.

(v)   <u>Leases</u>. To the best of Seller's knowledge, other than the lease between Seller and Operator and any occupancy rights of any residents of the Facility, there are no other leases affecting the Property.

(vi)   <u>Permits</u>. To the best of Seller's knowledge, Seller currently maintains in good standing and full force all of the material certificates, licenses and permits from all applicable governmental authorities in connection with the ownership of the Property.

(b)   <u>Seller's Knowledge</u>. Whenever a representation or warranty is made in this Agreement on the basis of Seller's knowledge or to the best of Seller's knowledge (or similar words), an individual will be deemed to have "knowledge" of a particular fact or other matter if such individual has actual knowledge, with no duty to investigate imposed on such individual.

(c)   <u>Survival of Representations and Warranties</u>. These representations and warranties are made as of the date hereof, shall be deemed remade as of the Closing Date and shall automatically expire as of the Closing Date.

10.   **Purchaser's Representations and Warranties.**<u>Representations and Warranties</u>. Purchaser hereby makes the following representations and warranties to Seller:

(i)   <u>Organization and Authority</u>. Purchaser is or will be duly organized and validly exists under the laws of the Commonwealth of Massachusetts and will be duly qualified to do business in the state in which the Property is located. Purchaser has full power and right to enter into and perform its obligations under this Agreement and the Other Documents. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby (i) have been duly authorized by all necessary action on the part of Purchaser, (ii) do not require any governmental or other consent (except as otherwise provided herein), and (iii) will not result in the breach of any agreement, indenture or other instrument to which Purchaser is a party or is otherwise bound. This Agreement and each other agreement contemplated hereby to which Purchaser is a party constitutes its valid and legally binding obligation, enforceable in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally or (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

(ii)   "<u>AS IS-WHERE IS</u>" <u>Condition of the Property</u>. PURCHASER ACKNOWLEDGES THAT IT HAS HAD AN ADEQUATE OPPORTUNITY TO INSPECT

THE PROPERTY AND HAS TO ITS SATISFACTION ADEQUATELY INSPECTED THE PROPERTY AND PURCHASER SHALL RELY EXCLUSIVELY ON ITS OWN INVESTIGATION OF THE PROPERTY, ACCEPTS THE RISK THAT ANY INSPECTION MAY NOT DISCLOSE ALL MATERIAL MATTERS AFFECTING THE PROPERTY, AND AGREES TO PURCHASE THE SAME IN ITS PRESENT "AS IS-WHERE IS" CONDITION.

(iii)    <u>Truth and Accuracy of Representations and Warranties</u>.    No representation or warranty by or on behalf of Purchaser contained in this Agreement and no statement by or on behalf of Purchaser in any certificate, list, exhibit or other instrument furnished or to be furnished to Seller by or on behalf of Purchaser pursuant hereto contains any untrue statement of fact, or omits or will omit to state any facts which are necessary in order to make the statements contained therein, in light of the circumstances under which they are made, not misleading in any respect.

(b)    <u>Survival of Representations and Warranties</u>.    These representations and warranties are made as of the date hereof, shall be deemed remade as of the Closing Date and shall survive the Closing.

11.    **Risk of Loss.**<u>Fire or Other Casualty</u>.    The risk of any loss or damage to any of the Property by fire or other casualty before the Closing hereunder is assumed by Seller.  Seller shall give Purchaser written notice of any fire or other casualty within three (3) days of the occurrence of same (but in any event prior to Closing), which notice shall include a description thereof in reasonable detail and an estimate of the cost of and time to repair.  In the event that the Property shall suffer any fire or other casualty or any injury and Purchaser does not elect to cancel this Agreement as hereinafter provided, Seller shall have the right to elect to:  (i) repair the damage at their sole cost and expense in a manner deemed reasonably acceptable to Purchaser, or (ii) assign to Purchaser the insurance proceeds, if any.  In the event of any material damage or destruction of the Property, Purchaser, within ten (10) days after notice thereof, by written notice to Seller, shall have the option to cancel this Agreement.  For the purposes of this <u>Section 10</u>, "material" damage or destruction shall include any damage or destruction that would require more than One Hundred Thousand Dollars ($100,000.00) to repair (including in said amount the amount of any revenues lost as a result of said fire or other casualty).  If Purchaser so elects to cancel this Agreement, this Agreement shall terminate and be of no further force and effect and neither party shall have any liability to the other hereunder.

(b)    <u>Eminent Domain</u>.    The risk of any loss or damage to the Property by condemnation before the Closing Date hereunder is assumed by Seller.  In the event any condemnation proceeding is commenced or threatened, Seller shall give Purchaser written notice thereof within three (3) days after the occurrence of same (but in any event prior to Closing), together with such reasonable details with respect thereto as to which Seller may have knowledge.  As soon as the portion or portions of the Property to be taken are reasonably determinable, Seller shall give Purchaser written notice thereof together with Seller's estimate of the value of the portion or portions of the Property to be so taken.  In the event of any material taking of the Property, Purchaser, by written notice to Seller within ten (10) days after notice thereof, shall have the option to cancel this Agreement, in which event this Agreement shall terminate and be of no further force and effect and neither party shall have any liability to the other hereunder.  For the purposes of this <u>Section 10</u>, a "material" taking shall include:  (i) any

13

taking (A) the effect of which would be to require more than Two Hundred Fifty Thousand Dollars ($250,000.00) to repair the balance of the Property or (B) materially impair the use or operation of the Property; or (ii) any threat of a taking or any reasonably equivalent indication on the part of a condemning authority of such intention where there is no reasonable basis to conclude that the actual taking would not be material.  If Purchaser shall not so elect to cancel this Agreement, then the sale of the Property shall be consummated at the Purchase Price provided for herein (without abatement) and Seller shall assign to Purchaser at the Closing all of Seller's right, title and interest in and to all awards made in respect of such condemnation and any claims in respect of any rent insurance or equivalent coverage maintained by it with respect to periods after Closing.  Purchaser shall be entitled to participate in any such condemnation proceeding, and Seller shall cooperate with Purchaser in such respect.

      12.    **Indemnification.By Purchaser**.  Purchaser shall indemnify, save, protect, defend and hold harmless Seller, their employees, affiliates, managers, shareholders, officers, directors and agents, and each of their successors and assigns, from and against all claims, liabilities, losses, damages, demands and causes of action of any nature whatsoever (including demands and causes of action relating to injury or death to persons or loss of or damage to Property), and all costs and expenses (including penalties and reasonable attorneys' and other professional fees and disbursements incurred in the investigation or defense of any such claims, or in asserting, pursuing or enforcing any such claims), whether or not resulting from third-party claims (collectively, "<u>Losses</u>") arising from, out of (i) Purchaser's ownership of the Property on or after the Closing Date, and (ii) any material inaccuracy or breach of any representation, warranty, covenant, agreement or obligation contained in this Agreement.  Purchaser further agrees to pay any reasonable attorneys' fees and expenses of Seller arising from any indemnification obligation hereunder.

      (b)    <u>Method of Indemnification</u>.  In the event that any liability, claim, demand or cause of action which is indemnified against by or under any term, provision, section or paragraph of this Agreement as set forth in <u>Section 11(a)</u> ("<u>Indemnitee's Claim</u>") is made against or received by any indemnified party (hereinafter "<u>Indemnitee</u>") hereunder, said Indemnitee shall notify the indemnifying party (hereinafter "<u>Indemnitor</u>") in writing within thirty (30) calendar days of Indemnitee's receipt of written notice of said Indemnitee's Claim, provided, however, that Indemnitee's failure to timely notify Indemnitor of Indemnitee's receipt of an Indemnitee's Claim shall not impair, void, vitiate or invalidate Indemnitor's indemnity hereunder nor release Indemnitor from the same, which duty, obligation and indemnity shall remain valid, binding, enforceable and in full force and effect so long as Indemnitee's delay in notifying Indemnitor does not, solely by itself, directly and materially prejudice Indemnitor's right or ability to defend the Indemnified Claim.  Upon its receipt of any or all Indemnitee's Claim(s), Indemnitor shall, in its sole, absolute and unreviewable discretion, diligently and vigorously defend, compromise or settle said Indemnitee's Claim at Indemnitor's sole and exclusive cost and expense and shall promptly provide Indemnitee evidence thereof within fourteen (14) calendar days of the final, unappealable resolution of said Indemnitee's Claim.  Upon the receipt of the written request of Indemnitee, Indemnitor shall within five (5) calendar days provide Indemnitee a true, correct, accurate and complete written status report regarding the then current status of said Indemnitee's Claim.  Prior to an Indemnification Default (as defined herein), Indemnitee may not settle or compromise an Indemnitee's Claim without Indemnitor's prior written consent.  Failure to obtain such consent shall be deemed a forfeiture by Indemnitee of its indemnification rights hereunder.

In the event that Indemnitor fails or refuses to indemnify, save, defend, protect or hold Indemnitee harmless from and against an Indemnitee's Claim and/or to diligently pursue the same to its conclusion, or in the event that Indemnitor fails to timely report to Indemnitee the status of its efforts to reach a final resolution of an Indemnitee's Claim, on seven (7) calendar days prior written notice to Indemnitor during which time Indemnitor may cure any alleged default hereunder, the foregoing shall immediately, automatically and without further notice be an event of default hereunder (an "Indemnification Default") and thereafter Indemnitee may, but shall not be obligated to, immediately and without notice to Indemnitor, except such notice as may be required by law and/or rule of Court, intervene in and defend, settle and/or compromise said Indemnitee's Claim at Indemnitor's sole and exclusive cost and expense, including but not limited to attorneys' fees, and, thereafter, within seven (7) calendar days of written demand for the same Indemnitor shall promptly reimburse Indemnitee all said Indemnitee's Claims and the reasonable costs, expenses and attorneys' fees incurred by Indemnitee to defend, settle or compromise said Indemnitee's Claims.

      (c)   <u>Survival</u>. The parties' obligations under this <u>Section 11</u> shall survive the Closing and remain effective for a period of twelve (12) months from the Closing Date.

    13.   **Remedies.**Due Diligence Period. Prior to the conclusion of the Due Diligence Period, Purchaser may terminate this Agreement upon written notice to Seller, in which case the Deposit, any Additional Deposit and any interest earned thereon shall be promptly refunded by Gulley & Straccia to Purchaser.

      (b)   <u>Seller's Default</u>. If after the Due Diligence Period (i) Seller defaults under any covenant, obligation or closing condition or materially breach any representation or warranty set forth herein (which default is not waived in writing by Purchaser) after ten (10) days' notice with an opportunity to cure, or (ii) Seller fails to perform any obligations of Seller contemplated herein, including Seller's required closing conditions, after ten (10) days' notice with an opportunity to cure (and such failure is not waived in writing by Purchaser), then Purchaser may terminate this Agreement by written notice to Seller and Agent and Gulley & Straccia shall promptly refund the Deposit and the Additional Deposit to Purchaser.

      (c)   <u>Purchaser's Default</u>. If after the Due Diligence Period (i) Purchaser defaults under any covenant, obligation or closing condition or materially breaches any representation or warranty set forth herein (which default is not waived in writing by Seller) after ten (10) days' notice with an opportunity to cure, or (ii) Purchaser fails to perform any obligations of Purchaser contemplated herein, including Purchaser's required closing conditions, after ten (10) days' notice with an opportunity to cure (and such failure is not waived in writing by Seller), then Seller shall have the right to declare this Agreement terminated by written notice to Purchaser and Agent and to receive the Deposit and the Additional Deposit as liquidated damages and Gulley & Straccia shall promptly pay the Deposit and the Additional Deposit to Seller for Purchaser's default.

    14.   **Notices.** All notices, demands or other communications given hereunder shall be in writing and shall be deemed to have been duly delivered (a) upon the delivery (or refusal to accept delivery) by messenger or overnight express delivery service (or, if such date is not on a business day, on the business day next following such date), or (b) on the third (3rd) business day

next following the date of its mailing by certified mail, postage prepaid, at a post office maintained by the United States Postal Service, or (c) upon sending by email transmission, addressed as follows:if to Seller: _____ c/o Y.C. Rubin

Chief Restructuring Officer
1600 63rd St.
Brooklyn, NY 11204-2713
Email:  YCR@windsorglobal.com

with a copy to:   Kevin J. Nash
Goldberg Weprin Finkel Goldstein LLP
1501 Broadway, 22nd Floor
New York, NY 10036
Email:  knash@gwfglaw.com

if to Purchaser:   [Armando Petruzziello

20 Milton Street, Suite 109
Dedham, MA 02026

with a copy to:Pasquale Straccia, Esq,
Gulley & Straccia, PC
24 Glenwood Avenue
Walpole, MA 02081
Email:  pstraccia@gulleylaw.com

Either party may, by notice given as aforesaid, change the address or addresses, or designate an additional address or additional addresses, for its notices, provided, however, that no notice of a change of address shall be effective until actual receipt of such notice.

    15.   **Closing Costs.**  Each party shall pay it's own fees, costs, expenses and taxes incurred with respect to the transactions hereunder; each party further agrees to pay its own attorneys' fees incurred in connection with the negotiation, preparation and consummation of the transactions contemplated hereby.  **Choice of Law.**  THIS AGREEMENT SHALL BE GOVERNED AND CONTROLLED BY THE INTERNAL LAWS OF THE COMMONWEALTH OF MASSACHUSETTS AS TO INTERPRETATION, ENFORCEMENT, VALIDITY, CONSTRUCTION, EFFECT, AND IN ALL OTHER RESPECTS. ANY DISPUTE, CLAIMS OR ACTIONS RELATING TO THIS AGREEMENT MAY ONLY BE ENFORCED IN THE BANKRUPTCY COURT BASED UPON THE PURCHASER'S VOLUNTARY CONSENT TO SUCH JURISDICTION, AND PURCHASER WAIVES ANY RIGHT TO CHALLENGE THE JURISDICTION OF THE BANKRUPTCY COURT OR TO TRANSFER VENUE OF A DISPUTE, CLAIM OR ACTION RELATING TO THIS AGREEMENT FROM THE BANKRUPTCY COURT TO ANOTHER FORUM.**Miscellaneous.**Entire Agreement.  This Agreement, together with all exhibits and schedules attached hereto and any other agreements referred to herein, constitutes the entire understanding between the parties with respect to the subject matter hereof, superseding all negotiations, prior discussions and preliminary agreements.

(b) <u>Modification/Amendment</u>.  This Agreement may not be modified or amended except in writing signed by the parties hereto.

(c) <u>Waiver</u>.  No waiver of any term, provision or condition of this Agreement, shall be deemed to be or be construed as a further or continuing waiver of any such term, provision or condition of this Agreement.  No failure to act shall be construed as a waiver of any term, provision, condition or rights granted hereunder.

(d) <u>Attorneys' Fees in the Event of Dispute</u>.  In any dispute between the parties hereto that results in arbitration or litigation (including any enforcement action of an arbitration award or any action to compel arbitration or change venue), the prevailing party shall be reimbursed for all reasonable costs and expenses, including, but not limited to, reasonable attorneys' fees.

(e) <u>Headings</u>.  The headings of the various Sections of this Agreement have been inserted only for the purposes of convenience, are not part of this Agreement and shall not be deemed in any manner to modify, explain, qualify or restrict any of the provisions of this Agreement.

(f) <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall for all purposes be deemed an original, but all of such counterparts shall together constitute one and the same agreement.  Signatures sent by telecopy or electronic mail transmissions shall constitute originals.

(g) <u>Successors and Assigns</u>.  This Agreement shall bind and inure to the benefit of the respective heirs, executors, administrators, personal representatives, successors and permitted assigns of the parties hereto; provided, however, that neither party hereto shall assign this Agreement without the prior written consent of the other party.  Any assignment not permitted hereunder and undertaken without such prior written consent shall be deemed null and void.

(h) <u>Further Assurances</u>.  Each of Seller and Purchaser shall provide to the other such further assurances as may reasonably be required hereunder to effectuate the purposes of this Agreement and, without limiting the foregoing, shall execute and deliver such affidavits, certificates and other instruments as may be so required hereunder so long as the same shall not materially increase the liability of the party so executing and delivering said instrument.

(i) <u>Severability</u>.  If any term or provision of this Agreement shall to any extent be held invalid or unenforceable, the remaining terms and provisions of this Agreement shall not be affected thereby, but, each term and provision shall be valid and be enforced to the fullest extent permitted by law.

(j) <u>Usage</u>.  All nouns and pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons, firm or firms, corporation or corporations, entity or entities or any other thing or things may require, or "any" shall mean "any and all"; "or" shall mean "and/or" and "including" shall mean "including without limitation.

(k)    <u>No Strict Construction</u>.    The language used in this Agreement is the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any of the parties hereto.

(l)    <u>Time of the Essence</u>.    Time shall be of the essence in this Agreement, except    for    matters    involving    Bankruptcy    Court    scheduling    and    hearings.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be signed as of the day and year first above written.

**SELLER**

20 Kinmonth Road, LLC

By: _____

Name:

Its:

**PURCHASER**

Armando Petruzziello

[_____]

By: _____

Name:

Its:

*[Signature Page to Asset Purchase Agreement]*

**SCHEDULE 1(b)**

**EXCLUDED ASSETS**

## EXHIBIT A

## LEGAL DESCRIPTION OF LAND

A certain parcel of land situated on Kinmonth Road in Newton, Middlesex County, Massachusetts shown on a plan entitled "Plan of Land at West Corner of Beacon Street, Windsor Road & Kinmonth Road, Waban - Mass. "dated June 29, 1959, by Wm. E. Leonard - C.E., recorded with Middlesex South District Registry of Deeds, Book 9433, Page 472, bounded and described as follows:

NORTHEASTERLY by Kinmonth Road as shown on said plan by two lines measuring one hundred forty-three and 82/100 (143.82) feet and eighteen and 15/100 (18.15) feet, respectively;

SOUTHEASTERLY by Lot A-1 as shown on said plan two hundred thirty-two and 42/100 (232.42) feet;

SOUTHWESTERLY by land now or formerly of Metropolitan Transit Authority as shown on said plan sixty-nine and 4/100 (69.04) feet;

WESTERLY by land now or formerly of Brae Bum County Club as shown on said plan two hundred thirty-two and 77/100 (232.77) feet.

Being that portion of Lot A as shown on the aforesaid plan located, northwesterly, of a dashed line constituting the northwesterly boundary of the area designated "Area A-1" on said plan.

Together with the right to use Kinmonth Road for all purposes for which streets and ways are commonly used in the City of Newton, in common with others.

**EXHIBIT B**

**FORM OF DEED**

WARRANTY DEED

**20 Kinmonth Road, LLC**, a Delaware limited liability company, with a mailing address 17 Van Winkle Road, Wesley Hills, New York, 109952

For consideration paid, and in full consideration of Four Million Two Hundred Fifty Thousand US Dollars ($4,250,000.00)

Grants to Armando Petruzziello, or his nominee, of 20 Milton Street, Suite 109, Dedham, Massachusetts, 02026

With *WARRANTY COVENANTS*

A certain parcel of land situated on Kinmonth Road in Newton, Middlesex County, Massachusetts, shown on a plan entitled "Plan of Land at West Corner of Beacon St, Winds or Rd. & Kinmonth Rd. Waban - Mass." dated June 29, 1959, by Wm. E. Leonard - C.E., rec rded with Middlesex County Registry of Deeds, Book 9433, Page 472, bounded and described 8.l follows:

| | |
|---|---|
| NORTHEASTERLY : | by Kinmonth Road as shown on said plan by two lines measuring one hundred forty-three and 82/100 (143.82) feet and eighteen and 15/100 (18.15) feet, respectively; |
| SOUTHEASTERLY | by Lot A-1 as shown on said plan two hundred thirty-two and 42/100 (232.42) feet; |
| SOUTHWESTERL Y | by land now or formerly of Metropolitan Transit Authority as shown on said plan sixty-nine and 4/100 (69.04) feet; and |
| WESTERLY | by land now or formerly of Brae Burn Country Club as shown on said plan two hundred thirty-two and 77/100 (232.77) feet. |

Being that portion of Lot A as shown on the aforesaid plan located northwesterly OJ a dashed line constituting the northwesterly boundary of the area designated "Area A-1" on said plan.

Said premises are conveyed with the right to use Kinmonth Road for all purposes for which streets and ways are commonly used in the City of Newton subject to the rights of others to use the same as set forth in a deed recorded with said Registry, Book 2782, Page 342.
Said land is conveyed subject to and with the benefit of any rights, easements, restrictions and reservations of record, insofar as any or all of the same are in force and applicable as of the date hereof.

Meaning and intending to convey the same premises conveyed to the grantor by deed recorded on March 7, 2014 with the Middlesex County Registry of Deeds, Book 63346, Page 384.

THE WITHIN CONVEYANCE IS NOT A TRANSFER OF ALL OR SUBSTANTIALLY ALL OF THE ASSETS OF THE GRANTOR

Witness my hand and seal this _____day of _____, 2018

**20 Kinmonth Road, LLC**

                    _____
                    By: _____
                    Its: _____

STATE/COMMONWEALTH OF _____
County: _____

      On this _____day of _____, 2018, before me, the undersigned notary public, personally appeared _____, as a _____ and person authorized to execute documents with respect to real property for **20 Kinmonth Road, LLC**, who proved to me through satisfactory evidence of identification, which was _____, to be the person whose name is signed above, and acknowledged the foregoing to be signed by him voluntarily for its stated purpose, as the duly-authorized _____and person authorized to execute documents with respect to real property for **20 Kinmonth Road, LLC**, as the voluntary act of **20 Kinmonth Road, LLC**.

                    _____
                    Notary Public
                    My Commission Expires:

## EXHIBIT C

## FORM OF GENERAL ASSIGNMENT

### GENERAL ASSIGNMENT

**THIS ASSIGNMENT**, is made as of the ___ day of _____ 2018, by 20 Kinmonth Road, LLC, a Delaware limited liability company ("Assignor"), to [ _____ ] ("Assignee").

### W I T N E S S E T H:

**WHEREAS**, by the Asset Purchase Agreement (the "APA"), dated as of _____, 2018, by and among Assignor and Assignee, Assignor agreed to sell to Assignee certain real properties, improvements, fixtures, personal properties and such other assets, as more fully described in the APA (the "Properties") (capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the APA); and

**WHEREAS**, the APA provides, inter alia, that Assignor shall assign to Assignee, Assignor's intangible properties, the Warranties, the Permits and such other items applicable to the Properties, as more fully provided in the APA;

**NOW, THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby agrees as follows:

1.    **Transfer of Intangible Properties**.  Assignor hereby assigns, sets over and transfers to Assignee all of Assignor's right, title and interest in, to and under all intangible properties, to the extent the same constitute Properties pursuant to the APA.

2.    **Transfer of Warranties**.  Assignor hereby assigns, sets over and transfers to Assignee, all of Assignor's right, title and interest in, to and under the Warranties.

3.    **Transfer of Permits**.  Assignor hereby assigns, sets over and transfers to Assignee, all of Assignor's right, title and interest in, to and under the Permits.

4.    **Other Assets**.  Assignor hereby assigns, sets over and transfers to Assignee all of Assignor's right, title and interest in, to and under any of the Other Assets, which transfer may be effectuated only through an instrument for such assignment.

5.    **Assumption**.  Assignee hereby accepts the foregoing assignments set forth in Sections 1, 2, 3, and 4 hereof, provided, that said assignment and assumption shall in all respects be subject to the terms of the APA with regard to the rights and obligations of each of the parties hereto with respect to the items assigned hereunder, and in the event that any term of this Assignment shall contradict the APA, the APA shall control.

7. **Miscellaneous**. This Assignment and the obligations of Assignor and Assignee hereunder shall survive the closing of the transactions referred to in the APA shall be binding upon and inure to the benefit of Assignor and Assignee, and their respective successors and assigns, shall be governed by and construed in accordance with the laws of the State of New York and may not be modified or amended in any manner other than by a written agreement signed by the party to be charged therewith.

**(Signatures on following page)**

**IN WITNESS WHEREOF**, Assignor has duly executed this Assignment as of the day and year first above written.

**ASSIGNOR**

20 Kinmonth Road, LLC

By: _____
Name:
Its:

**ASSIGNEE**

[_____]

By: _____
Name:
Its:

## EXHIBIT D

## FORM OF FIRPTA AFFIDAVIT

### FIRPTA AFFIDAVIT

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real properties interest must withhold tax if the transferor is a foreign person.  To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real properties interest by 20 Kinmonth Road, LLC, a Delaware limited liability company (the "Seller"), the undersigned hereby certifies on behalf of Seller as follows:

1.      Seller is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2.      Seller is not a disregarded entity as defined in §1.1445-2(b)(2)(iii);

3.      Seller's employer identification number is _____; and

4.      Seller's office addresses are _____.

Seller understand that this certification may be disclosed to the Internal Revenue Service by Purchaser and that any false statement made here could be punished by fine, imprisonment, or both.

Under penalties of perjury I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of Seller.


Date: _____          **20 Kinmonth Road, LLC**

                                   By: _____
                                   Name:
                                   Its:

D-1